IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 04-20314-CIV-ALTONAGA/BANDSTRA

EDWARD LIPUMA, on behalf of Himself and All )
Others Similarly Situated and on Behalf of the )
General Public, )
        )
            Plaintiff, )
        )
    v. )
        )
AMERICAN EXPRESS COMPANY, a New York )
Corporation, et al., )
        )
            Defendants. )

**BRIEF OF DEFENDANTS AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. AND AMERICAN EXPRESS CENTURION BANK IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT**



# I. INTRODUCTION.

The instant nationwide class settlement (the "Settlement") resolves a barrage of class action lawsuits brought throughout the country against various American Express entities (collectively "American Express").  In March 2003, certain plaintiffs (who support this Settlement) sued American Express in California, alleging that American Express failed adequately to disclose its practices regarding the currency conversion of foreign credit and charge card charges.  Thereafter, at least nine other similar putative class action lawsuits were filed in California, Illinois, Texas, New York and Florida.  Seeking freedom from this drumbeat of litigation, American Express entered into the Settlement, which has a value in excess of $75 million and provides substantial monetary and equitable benefits to the class, notwithstanding that the claims at issue have no real merit and a small likelihood of success.

The Settlement proposed here is the result of lengthy, informed, arms' length negotiations between several groups of experienced class counsel and American Express, including numerous mediation sessions before several former federal judges.  There is no evidence of collusion whatsoever, and the Settlement clearly is not the product of clandestine, back-room negotiations.  Instead, the Settlement is fair, reasonable and adequate because it provides substantial benefits to the Settlement Class.

At the heart of Plaintiffs'/Intervenors' claims here is that American Express allegedly failed adequately to disclose its foreign currency conversion ("FX") practices, including a 1% to 2% FX rate adjustment, the rounding of the FX rate in Turkey, a competitive FX rate adjustment in certain currencies and the purported "spread" between the "buy" and "sell" rates used by American Express in FX transactions.  As detailed below, however, American Express has always properly disclosed its FX practices in its cardmember agreements, a fact which has been confirmed by numerous class members responding to the Settlement notice.  Indeed, Intervenors' counsel have admitted in open court that they read their cardmember agreements and were aware of the 2% FX rate adjustment.  In addition, there can be no dispute here that American Express' FX practices have always resulted in FX rates favorable to American Express' cardmembers –

-1-

cardmembers receive wholesale-based FX rates not otherwise available to them. Moreover, the claims of the Plaintiffs/Intervenors here are subject to an Arbitration Provision contained in American Express' cardmember agreements that expressly precludes any claims from being pursued on a class basis and already has been upheld in one of the state court cases. As a result, American Express submits that the claims here are weak and the potential for liability minimal.

Despite the weakness of the claims, the onslaught of lawsuits across the country (both actual and potential) warranted an attempt by American Express to settle and obtain complete peace on the FX claims. Peace has been achieved through difficult negotiations and at substantial cost. The Settlement here provides, among other things, that American Express will (1) make significant changes in its disclosure practices;[1] (2) pay up to $75,000,000.00 to the class and its counsel (plus substantial additional costs of class notice and administration, estimated to exceed $7,000,000.00); and (3) refund to individual class members on a claims-made basis up to 100% of the 1% to 2% FX rate adjustment paid by them (an amount that is an easily identifiable calculus for the monetary consideration to class members for any and all types of FX claims). Although some objectors argue that a portion of the $75,000,000.00 will unfairly revert to American Express, the probable reality is that, given the substantial number of claims made to date (646,293), the entire $75,000,000.00 will be paid. Arguments that the claims-made process is somehow inadequate are similarly baseless because this process allows those class members who feel aggrieved to make a choice as to whether to obtain a refund and prevents a watered-down recovery that would result from an expensive and burdensome "direct credit" process. Given the response thus far, certain cardmembers do not wish to make a claim because they believe that American Express has done nothing wrong. Regardless, American Express has never considered making refunds on any other basis and will not agree to do so. Simply put, the recovery provided by the Settlement falls well within the range of reasonableness, particularly given the weakness of the claims at issue.

---

[1] In connection with the Settlement, American Express already has implemented disclosure changes. Absent final approval, however, it is not obligated to keep them in place.

DEFENDANTS' BRIEF IN SUPPORT OF FINAL APPROVAL
Case No. 04-CV-20314 Altonaga/Bandstra

The fairness of the Settlement is further exemplified by the relatively few objections made to the Settlement (40 objections received compared to 8,822,803 settlement notices mailed -- .00045%) and the small number of opt-outs (1,159). Some of the parties who have objected to the Settlement (including, in particular, the Intervenors) have done so to pursue their own individual pecuniary gain, and not because the Settlement has any obvious (or latent) indications of unfairness. Indeed, such objections amount to nothing more than the typical efforts of attorneys seeking to grab their own "piece of the pie." In fact, many cardmembers have written in support of American Express, stating that they believe that American Express has done nothing wrong. One such cardmember forwarded a $100 check to American Express' counsel "as a small, personal contribution in defense of this litigation suit"; the check graciously was returned.

In summary, there is no part of this Settlement, including its terms and the underlying negotiations, that bears any indication of unfairness, inadequacy or unreasonableness. This is a huge settlement, including both significant disclosure changes and cash, reached in response to what could be viewed as nuisance claims. While any fortune-seeking objector or intervenor can manufacture issues or concerns or posit how the Settlement could be different, it is wholly proper. Accordingly, American Express respectfully requests that this Court grant final approval of the Settlement.

## II. FACTUAL BACKGROUND.

### A. FOREIGN CURRENCY CONVERSION LITIGATIONS AGAINST AMERICAN EXPRESS.

On April 7, 2003, in <u>Schwartz v. Visa International Corp.</u> ("<u>Schwartz</u>"), a California state trial court made public its decision after a lengthy trial that Visa and MasterCard committed unfair and deceptive business practices under California's Unfair Competition Law, California Business & Professions Code Section 17200, <u>et seq.</u> (the "UCL"), by failing to require their member banks adequately to disclose a 1% "surcharge" they required to be applied to all transactions in foreign currencies. There was extensive press coverage of this decision,

-3-

including headlines stating that $800 million in refunds had been ordered by the court.  See accompanying Declaration of Scott M. Pearson ("Pearson Decl."), ¶ 4, Ex. A.[2]  (In fact, the Schwartz court ultimately ordered a claims made process.)

While the Schwartz decision turned on the complete absence of disclosure of the 1% conversion rate adjustment by Visa and MasterCard, as discussed below, American Express always has expressly disclosed its 1-2% rate adjustment in its cardmember agreements.  Thus, the Schwartz lawyers previously had determined not to pursue similar claims against American Express.  Emboldened by their success in Schwartz, however, they filed an action against American Express in the same California state court entitled Environmental Law Foundation v. American Express Company, Superior Court of California, County of Alameda, Case No. BG03089146 (filed on March 28, 2003) (the "ELF" Action").  Soon thereafter, numerous "copycat" cases were filed across the country making similar allegations.[3]

The first group of cases following the ELF Action focused principally on American Express' use of a 1-2% rate adjustment for transactions made in foreign currencies, which plaintiffs typically have referred to as a "surcharge" or "fee."  However, discovery in the ELF Action also explored other foreign currency conversion practices of American Express.  For example, discovery propounded in the ELF Action sought, among other things, information and documents:  (i) "reflecting the manner of ascertaining or setting the particular interbank, tourist

---

[2] Visa and MasterCard vigorously disputed the Court's findings and immediately signaled their intention to appeal, and later did so.  The appeal is pending.

[3] These cases include Arambula v. American Express Company, District Court of Cameron County, Texas, Case No. 2003-05-2448-D (May 16, 2003); Bildstein v. American Express Company, Supreme Court of Queens County, New York, Index No. 15029-03 (July 2003); Fuentes v. American Express Travel Related Services Company, Inc., District Court of Hidalgo County, Texas, Case No. C-848-03-B (May 2003); Janowitz v. American Express Company, et al., Circuit Court of Cook County, Illinois; Case No. 03CH15385 (September 15, 2003); LiPuma v. American Express Company, Florida Circuit Court of the 11th Judicial District, Case No. 03-19365 CA 09 (August 2003); Rubin v. American Express Company, Circuit Court of Madison County, Illinois, Case No. 03-L-530 (April 22, 2003); Wick v. American Express Company, Circuit Court of Cook County, Illinois, Case No 03CH07811 (May 2, 2003); Paul v. American Express Company, Superior Court of California, County of Orange, Case No. 04CC00015 (January 13, 2004) (the "Paul" Action"); and Ball v. American Express Company, Superior Court of California, County of San Joaquin, Case No. CV024562 (August 17, 2004) (the "Ball Action").

-4-

or official rate of exchange [American Express] used as a basis for the BASE RATE used to convert foreign currency denominated charges into U.S. dollars;" (ii) "sufficient to show the methodology by which American Express arrived at the actual BASE RATES used to convert charges initiated by a US cardholder in a foreign currency;" (iii) "sufficient to identify the BASE RATES and the interbank tourist or official rate on which the BASE RATES were 'based' with respect to the 25 highest volume currencies;" and (iv) "comprising 'studies and reports regarding currency conversion issues'" or "market research and competitive studies related to currency conversion rates or services." See Pearson Decl., ¶ 4, Ex. B at 5-6. Discovery also was sought concerning losses and gains from, and costs associated with, American Express' foreign currency conversion operations. See id. In depositions in the ELF Action, and also in informal interviews in the instant case, witnesses were questioned about intricate details of American Express' foreign currency conversion practices having nothing to do with the "2% fee." For example, Peter Sisti, the senior American Express Treasury officer responsible for American Express' FX practices, testified about American Express' rate-selection methodologies, competitive positioning studies and conversion practices. See id., ¶ 5. Needless to say, the aggressive pursuit of this discovery in the ELF Action signaled to American Express that the plaintiffs in that case were focusing on claims unrelated to the 2% issue.

The two latest-filed cases involving American Express' foreign currency conversion practices raise similar issues. The Paul Action, filed in a different California state court, challenged certain rounding practices employed by American Express when converting transactions in Turkey from Turkish Lira to U.S. Dollars. See id., ¶ 6. The Ball Action, filed in a third California state court, while vague in its allegations, challenged American Express' alleged failure adequately to disclose the costs it incurs in converting foreign currency. See id., ¶ 6. All of the cases, however, ultimately are the same in that they contend that American Express does not adequately disclose to consumers its methodology for converting foreign currency charges into U.S. Dollars.

Despite the fact that none of these cases are meritorious, their mere pendency imposed considerable burden on American Express. Most obviously, because the cases were filed in different state courts around the country, it was not possible to consolidate them and American Express would have been forced to defend essentially the same case in ten different jurisdictions. Furthermore, the multiplicity of actions posed the risk of inconsistent rulings and endless litigation and appeals regarding the same issues. Accordingly, the expense and distraction of these multiple litigations was a critical factor in the determination by American Express to seek a global settlement of all foreign currency conversion litigation which had been or could have been pursued against it.

## B.   AMERICAN EXPRESS' CURRENCY CONVERSION PRACTICES AND DISCLOSURES.

### 1.   The Mechanics Of Foreign Currency Conversion.

When a U.S. cardmember uses his or her American Express card to make a purchase in a foreign currency, American Express pays the merchant in the foreign currency but bills the cardmember in U.S. dollars. In order to do this, American Express must convert the amount of the charge from the foreign currency to U.S. dollars for billing purposes. It performs this conversion by using a currency exchange rate, which may be an interbank, tourist or official rate depending on the country where the transaction took place, with an adjustment of up to 2% in accordance with American Express' cardmember agreements. See accompanying Declaration of Craig Morlen ("Morlen Decl."), ¶ 2.[4] Interbank rates, which are used in most countries, are wholesale rates used in large-volume currency trading between major financial institutions.[5] See id., ¶ 3. Because consumers do not trade currency in these large volumes, interbank rates are simply not available to them; the rates are considerably more favorable than what consumers could obtain through the retail currency trading market. See id. For this reason, even after

---

[4] The amount of the rate adjustment has varied over time.

[5] American Express obtains interbank rates from the Reuters information system and other customary sources. See id., ¶ 3.

American Express adjusts the interbank rates to reflect the service it is providing to cardmembers, the conversion rates used by American Express for cardmember transactions are significantly better than rates available from other sources, including the retail currency trading market, and are aligned competitively with rates offered by other credit card issuers. See id., ¶ 4.

In providing FX services to its cardmembers, American Express bears the significant risk of currency fluctuations. See id., ¶ 5. In order to hedge its foreign currency exposure, American Express buys and sells currency in the interbank foreign exchange markets. See id. These "clearing" transactions are not made in connection with individual cardmember charges, but rather based on American Express' aggregate foreign currency positions. See id. In other words, American Express does not purchase Euros every time a cardmember makes a purchase in Euros, but only when it deems a Euro currency "clearing" transaction necessary to hedge its overall foreign currency exposure. See id. Thus, with respect to an individual cardmember transaction, it is not possible to identify the precise "cost" of providing the foreign currency, as one might do with respect to a gallon of milk sold in a supermarket. The management of American Express' global currency trading is extraordinarily complex and not amenable to disclosure on a transaction-by-transaction basis. Id.

Between approximately March 1999 and October 2002, American Express made certain additional adjustments to interbank rates in a limited number of markets. See id., ¶ 6. These "competitive adjustments" were made during discrete time periods in addition to the 2% rate adjustment in order to offer rates competitive in the marketplace, including with respect to rates offered by Visa and MasterCard. See id. For example, for the Euro-based markets, from January 2001 to October 2002, American Express adjusted the exchange rate by an additional 0.35%.[6] See id. Contrary to the suggestion of certain objectors, all "competitive adjustments" were eliminated by American Express in October 2002; they are no longer being used anywhere. See id. Historically, American Express did not separately track the revenue earned from application of "competitive adjustments." However, as set forth in the Declaration of Craig

---

[6] As discussed below, American Express' disclosures expressly permit these adjustments.

Morlen, American Express estimates that the revenue received from application of "competitive adjustments" to U.S. cardmember transactions was less than $45,000,000.00. See, id., ¶ 7.

In the late 1990s, the Turkish Lira began to devalue rapidly. The Lira traded at approximately 270,000 Lira per U.S. Dollar in June 1998; 500,000 Lira per Dollar in December 1999; and 1.6 million Lira per Dollar in June 2002. See id., ¶ 11. Because the data processing systems utilized by American Express to perform currency conversion calculations have limitations with respect to the number of decimal places they can use, the devaluation of the Lira materially impacted American Express' Turkish currency trading exposure in that normal mathematical rounding began to have a significant impact. See id.[7] Accordingly, to protect itself against this exposure, American Express in January 2000 began to add 4 to the last digit used by its data processing systems before rounding transactions in Turkish Lira, which had the effect of causing the last digit to round up more often than it rounded down. See id., ¶ 12. This practice had the effect, in the aggregate, of adding approximately 8% to cardmember transactions in Turkey. See id.. However, because of the devaluation of the Lira, the 2% rate adjustment was not applied in Turkey and the net effect was approximately 6%. See id. In September 2002, American Express reduced the number it added to the last decimal place from 4 to 2, which reduced the impact of rounding up more often than rounding down to approximately 3%, with a net effect of approximately 1% because the 2% rate adjustment was not applied. See id., ¶ 13. In December 2004, American Express ceased this practice and resumed normal rounding. See id. Thus, between February 1999 and December 2004, the approximate aggregate effect of this practice was to increase cardmember transaction amounts by approximately 6.58%, with a net effect of 4.58%.[8] See id., ¶ 14. On January 1, 2005, Turkey changed its currency to the New Turkish Lira, which currently trades at approximately 1.5 New Turkish Lira to US$1.00 and

---

[7] No other currency devalued to this extent during the relevant time period. See id., ¶ 11.

[8] This number is calculated from 43 months of an 8% impact and 17 months of a 3% impact. See id., ¶ 14.

therefore is unaffected by the decimal place limitations of American Express' systems.  See id., ¶ 15.  These rounding practices were not used in any other country.  See id. ¶ 13.

**2.    At All Relevant Times, American Express Has Expressly Disclosed Its Foreign Currency Conversion Practices.**

Since at least March 1997, before the beginning of the class period here, American Express' cardmember agreements expressly have disclosed its methodology for converting charges made in foreign currencies (with slight variations) as follows:

CHARGES MADE IN FOREIGN COUNTRIES

If you incur a charge in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents at a rate set by us based on an interbank, tourist or (where required by law) official rate, increased in each instance by [1-2%].[9]  This rate may differ from rates in effect on the date of your charge.  Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

See accompanying Declaration of Gillen Clements ("Clements Decl."), ¶ 6, Ex. A (exemplar agreement).  In approximately September 2003, American Express modified the language to read as follows:

**TRANSACTIONS MADE IN FOREIGN CURRENCIES**

If you incur a Charge in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents.  Unless a particular rate is required by applicable law, you authorize us to choose a conversion rate that is acceptable to us for that date.  Currently, the conversion rate we use for a Charge in a foreign currency is no greater than (a) the highest official conversion rate published by a government agency, or (b) the highest interbank conversion rate identified by us from customary banking sources, on the conversion date or the prior business day, in each instance increased by 2%.  This conversion rate may differ from rates in effect on the date of your Charge.  Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

See id., ¶ 7, Ex. B (exemplar agreement).

Although American Express' foreign currency conversion disclosures until very recently were not repeated on billing statements, sufficient information has been provided to cardmembers to enable them to determine the conversion rate used by American Express (i.e., the adjusted base rate).  See id., ¶ 8.  Specifically, the line item for each foreign charge indicates

_____

[9] The amount of the rate adjustment has varied over time.

DEFENDANTS' BRIEF IN SUPPORT OF FINAL APPROVAL
Case No. 04-CV-20314 Altonaga/Bandstra

the amount of the charge in foreign currency and the amount of the charge as converted by American Express into U.S. Dollars.  See id.  Thus, the cardmember can determine the conversion rate by simply dividing the foreign currency amount by the U.S. dollar amount.  See id.  Importantly, were a cardmember to use an alternative form of currency conversion, such as purchasing foreign currency at a bank, the cardmember would not know how the conversion rate was determined, but only the overall conversion rate being offered.  This is the same information provided to cardmembers on billing statements, and the only information a cardmember needs to compare rates.

**C.    ARBITRATION PROVISION.**

Since April 1999, American Express' cardmember agreements have included an Arbitration Provision which provides, in pertinent part:

> IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO ENGAGE IN PRE-ARBITRATION DISCOVERY EXCEPT AS PROVIDED FOR IN THE CODE OF PROCEDURES OF THE NAF, JAMS OR AAA, AS APPLICABLE.  FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION.  EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING.  NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.

> There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers or other persons similarly situated; provided however, that the claimant's individual Claim would be subject to this Arbitration Provision.  Furthermore, Claims brought by or against a Cardmember(s) of one Account may not be joined or consolidated in the arbitration with Claims brought by or against any other Cardmember(s) of any other Account, unless otherwise agreed to in writing by all parties.

*        *        *

> **Note to California residents**:  This Arbitration Provision shall not apply to you unless and until you use the Card after we notify you in writing that it is applicable in California.

-10-

See <u>id.</u>, ¶ 9, Ex. D.  Starting in approximately November 2003, the Arbitration Provision was amended to apply to California residents.[10]  <u>See id.</u>, ¶ 10.  American Express routinely enforces the Arbitration Provision in class actions, and succeeded in doing so in the <u>Wick</u> and <u>Janowitz</u> foreign currency conversion cases filed against American Express in Cook County, Illinois.  <u>See</u> Pearson Decl., ¶ 7.[11]

## D.    **THE LIPUMA SETTLEMENT.**

The Settlement before this Court resulted from extended and difficult negotiations between American Express and a series of adversaries in the various FX cases discussed above. The history of these negotiations confirms that the interests of the settlement class have been well represented, and that a fair, reasonable and adequate settlement has been achieved.

### 1.    **The Original Agreement.**

From the beginning, faced with numerous actions pending in different jurisdictions around the country, American Express was committed to reaching a global settlement of all FX litigations.  In order to reach the settlement before this Court, American Express negotiated separately with six different groups of plaintiffs' lawyers, all at arm's length.  With the assistance of two former United States District Judges who served as private mediators, a settlement finally was reached and then modified twice before being submitted to this Court for approval.

American Express first attempted to reach a global settlement in the <u>ELF</u> Action. Settlement discussions commenced nearly two years ago, when the plaintiffs in that case made a settlement proposal on April 18, 2003.  <u>See</u> Pearson Decl., ¶ 8.  From the beginning of the negotiation, American Express made clear that it required a global settlement of all claims relating to its FX practices, which could only be achieved before a federal court with power to stay all competing actions.  <u>See id.</u>  On November 10, 2003, the <u>ELF</u> plaintiffs and American

---

[10] All of the cardmember agreements for cards issued during the class period include a choice-of-law provision providing that the cardmember agreement is governed by applicable federal law and the laws of either Utah or New York.

[11] The plaintiffs in <u>Janowitz</u> agreed to arbitration after the ruling in <u>Wick</u>.

Express participated in a full-day mediation before the Honorable Layn R. Phillips, a former United States District Judge. See id. At that mediation, there was intense negotiation over the structure of the settlement, with the ELF plaintiffs demanding that American Express automatically credit (i.e. "direct pay") settlement proceeds to class members and American Express insisting that class members be required to submit claims in order to receive payments. See id. Because American Express would not settle without a claims process, the negotiations eventually proceeded on this basis. See id. The parties were unable to reach agreement on monetary relief at the mediation, but continued to negotiate through Judge Phillips until December 2, 2003, at which time discussions were terminated. See id.

On December 2, 2003, a hearing proceeded on American Express' motion to compel arbitration of the Bildstein FX case in New York.[12] See Pearson Decl., ¶ 9. During that hearing, the Court suggested that a decision on the motion be deferred so the parties could discuss settlement. See id. Cognizant of the likelihood that a global settlement would draw objections from the lawyers in other FX cases, American Express suggested that lawyers from another conversion case be included in the discussions to broaden support for any settlement that might be reached. Counsel in the LiPuma case therefore were invited to participate. See id.

The parties agreed to negotiate with the assistance of a mediator, and retained the Honorable Herbert L. Stern, a former United States District Judge and United States Attorney, for this purpose. See id., ¶ 10. Because LiPuma's counsel insisted upon discovery in advance of the mediation, American Express provided counsel with thousands of pages of documents relating to American Express' FX practices, deposition transcripts from related cases and other discovery materials, including all discovery taken in the ELF Action. See id. In addition, American Express permitted LiPuma's counsel to conduct extensive interviews of Mr. Sisti and Gillen Clements, the chief compliance officer for U.S. card products. See id.

_____

[12] Irving Bizar, Esq., who represents the plaintiff in Bildstein, is of counsel in this action and is a signatory to the Settlement.

-12-

On December 15, 2003, after the foregoing discovery was provided and reviewed, the parties met in New York City and participated in two days of intense mediation before Judge Stern. See Pearson Decl., ¶ 11. At the close of the second day of mediation, with the assistance of Judge Stern, the parties agreed upon the general terms of a nationwide settlement. See id. Among other things, the parties agreed to significant disclosure changes and payments to class members submitting claims of up to $66,000,000.00 (less attorneys' fees and certain charitable contributions) in exchange for the release of all FX claims against American Express. See id.

For two months following the close of mediation, the parties met and conferred nearly every day in intense negotiations regarding the details of the settlement. See id., ¶ 12. American Express did not reveal to the LiPuma and Bildstein lawyers any of the offers exchanged in the ELF negotiations, and it did not have the lawyers in these cases bid against one another. See id. During this two-month period, significant changes were made to the settlement to address issues raised by LiPuma's counsel. See id. Throughout this period, American Express also continued to provide to LiPuma's counsel copies of all discovery produced by American Express in related proceedings, including additional documents produced and transcripts of depositions taken in related actions. See id. Finally, the Settlement was agreed upon. On February 13, 2004, the parties sought preliminary approval from the Honorable Ursula Ungaro-Benages, which was granted four days later. See id.

### 2.   The First Modification Of The Settlement.

In her preliminary approval order, Judge Ungaro-Benages stayed all competing actions under the All Writs Act, leading plaintiffs in several of the FX cases, including ELF, Fuentes and Paul, to seek to intervene in LiPuma to prevent the Settlement from releasing their claims. See Pearson Decl., ¶ 13. Judge Ungaro-Benages recused herself shortly after granting preliminary approval and, on motion by certain intervenors, this Court vacated the preliminary approval order without prejudice on that basis. See id.

American Express immediately attempted to address the objections raised by the intervenors through further negotiations, and it ultimately secured support for the Settlement

-13-

from the ELF and Fuentes plaintiffs in exchange for modifications which included an increase in the Settlement Fund from $66,000,000.00 to $75,000,000.00, additional charitable contributions and a commitment by American Express to pay at least $32,500,000.00 regardless of the number of claims submitted.  See id., ¶ 14, Ex. C.  Counsel for the intervening ELF plaintiff, William Barrett, then associated into the case as co-counsel for the settlement class, and Mr. Barrett became an additional class representative.  See id., ¶ 14.  The Fuentes plaintiffs withdrew their objections and are supporting the Settlement as class members.  See id.

**3.      The Final Modification To The Settlement.**

The Paul Intervenors refused to join in the modified Settlement and sought extensive discovery from American Express regarding their claims based on American Express' rounding practices in Turkey.  See Pearson Decl., ¶ 15.  American Express provided this discovery on an expedited basis, including interviews of Mr. Clements and Craig Morlen, a senior American Express Treasury officer knowledgeable regarding American Express' conversion practices, including specifically the rounding of transactions in Turkish Lira.  See id.  During this time period, the Ball Action was filed in California and then stayed by this Court, leading the Ball plaintiffs to seek to intervene.  The Ball plaintiffs have participated in settlement-related discovery, including depositions of Mr. Clements and Mr. Morlen, written discovery and document productions, and have been provided all discovery taken in this and the related cases.  See id.

Despite substantial efforts, American Express and the LiPuma and ELF plaintiffs were unable to settle the objections raised by the Paul and Ball Intervenors.  Nonetheless, to address these objections, the LiPuma and ELF plaintiffs requested and American Express agreed to a third modification to the Settlement based on the discovery regarding the Turkey rounding claims.  See id., ¶ 16.  Specifically, because transactions in Turkey were uniquely affected by rounding so that base exchange rates were increased by approximately 6.58% rather than 2%, the plan of allocation was modified to permit class members who used their cards in Turkey to claim an additional 4.58% of Turkish Lira transaction amounts from the settlement fund in addition to

-14-

the 2% already allowed.  See id., ¶ 16.  On June 10, 2004, plaintiffs and American Express

moved for preliminary approval of the amended Settlement, which was granted by this Court on

October 15, 2004.  See id..

On December 8, 2004, Plaintiffs, American Express and the Paul and Ball Intervenors

participated in a full-day mediation before the Honorable Edward Infante, a former Federal

Magistrate Judge, seeking to resolve the remaining objections to the Settlement.  See id., ¶ 17.

The mediation was unsuccessful, and the Paul and Ball Intervenors continue to object to the

Settlement.

### 4.    The Settlement Class.

The Settlement Class agreed upon by the parties and certified for settlement purposes

only by this Court is defined as:

> All former or current American Express cardmembers or accountholders with
> U.S. billing addresses who incurred a charge denominated in a foreign currency,
> and paid that charge in U.S. dollars, during the time period between March 28,
> 1997 and October 15, 2004, and who did not negotiate (or on whose behalf there
> was not negotiated) a foreign currency conversion methodology for their
> American Express account(s).

### 5.    Settlement Terms.

#### a.    Disclosure Changes.[13]

American Express has agreed that, so long as the practices continue, it will revise its

disclosures relating to its FX practices, including the 2% "fee."  American Express has agreed to

change the form of both the monthly billing statement and the cardmember agreement.  When a

charge in foreign currency appears on a billing statement, American Express will conspicuously

print the following disclosure on the same page:  "Foreign currency conversion rate is base rate

plus 2%.  See page 2 for details."  Each charge in foreign currency on the statement will be

marked with asterisks or similar notations to direct the cardmember's attention to this disclosure

and a more detailed disclosure on the reverse of the billing statement.

---

[13] As discussed above, in connection with the Settlement, disclosure changes already have been
implemented.  However, American Express will not be obligated to maintain the changes unless
final approval is granted.

American Express also has agreed to disclose in detail how conversion rates are determined, and prominently disclose the 2% charge in bold type. The cardmember agreement will now state:

### TRANSACTIONS MADE IN FOREIGN CURRENCIES

If you incur a Charge in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents. Unless a particular rate is required by applicable law, you authorize us to choose a conversion rate that is acceptable to us for that date. Currently, the conversion rate we use for a Charge in a foreign currency is no greater than (a) the highest official conversion rate published by a government agency, or (b) the highest interbank conversion rate identified by us from customary banking sources, on the conversion date or the prior business day, **in each instance increased by 2%**. This conversion rate may differ from rates in effect on the date of your Charge. Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

Language similar to the above in the cardmember agreement will be printed on the reverse of periodic billing statements. These disclosures ensure that cardmembers will be alerted to the 2% charge and the methodology for selecting the base rate each time they have made a purchase in foreign currency. In addition, American Express has agreed that, between October 15, 2004 (the date the Court entered preliminary approval) and the date of the Final Order approving the Settlement, it will not increase the amount of the FX rate adjustment.

### b.    Monetary Consideration And Charitable Contributions.

American Express has agreed to a claims-made settlement amount of $75,000,000.00. This includes a $500,000.00 charitable contribution which represents the statutory damages provided for in the federal Truth in Lending Act. American Express has agreed to pay a minimum of $32,500,000.00 plus attorneys' fees, class notice costs and costs of settlement administration. In the event that the total payments pursuant to the Settlement do not exceed $75,000,000.00, American Express has agreed to make an additional charitable contribution to California-based charities approved by the Court of the lesser of $2,500,000.00 or the difference between the total claims paid and the $75,000,000.00 maximum. In addition, American Express has agreed to donate up to an additional $1,500,000.00 if the submitted claims are less than $30,000,000.00. American Express has also agreed to pay all costs of notice and claims

-16-

administration, which are substantial.  To date, American Express has incurred more than $3,400,000.00 in notice costs, and it expects to pay approximately $3,600,000.00 in costs of settlement administration.  Plaintiffs' counsel may apply for an award of attorneys' fees and costs not to exceed $11,000,000.00.  The remainder of the settlement amount, if any, will revert to American Express.[14]

Settlement payments to class members will be calculated as follows:

(i)     A class member whose account was opened after February 1, 1999 may claim an amount equal to 100% of the monetary amount paid by the class member as a result of the 1-2% rate adjustment imposed by American Express (the "FX amount") between February 1, 1999 (the earliest date on which required data is reasonably available) and October 15, 2004, the end of the class period;

(ii)    A class member whose account was opened before February 1, 1999 may claim an amount equal to 100% of the FX amount incurred by the class member between February 1, 1999 and October 15, 2004 and a flat amount of $15.00 for FX amounts incurred between March 28, 1997 and January 31, 1999; and

(iii)   A class member whose account was closed prior to February 1, 1999 may claim a flat amount of $15.00.

See Amended Stipulation and Agreement of Settlement, ¶ 2.5.  Since February 1, 1999 is the earliest date on which the required account-specific data is available, American Express will determine the amounts owed to class members whose accounts were opened after February 1, 1999 from its own records, and claimants will not be required to submit supporting documentation or to make calculations.  However, since the necessary records are not readily accessible for the period prior to February 1, 1999, the settling parties negotiated the $15.00 flat amount as part of the Settlement.  This amount is based, in part, upon the average FX amount incurred on a per cardmember basis for the time period from February 1, 1999 through June 2003.  Furthermore, class members who incurred charges in Turkish Lira may claim an additional amount equal to 4.58% of the class member's estimated dollar volume of charges in Turkish Lira between February 1, 1999 and January 31, 2004.

_____

[14] As discussed below, based on the huge number of claims already submitted, and the fact that the claims submission deadline is not until April 13, 2005, it appears unlikely that there will be a reversion.

-17-

6.      **The Release.**

In exchange for the consideration set forth above, as more particularly set forth in the Settlement Agreement, American Express will be released from all claims directly or indirectly alleged in the LiPuma Action "that are, were, or could have arisen out of or been related in any way to [American Express'] foreign currency conversion practices and the disclosures relating thereto." As discussed above, the purpose of the release is to secure "global peace" for American Express by putting an end to the multiplicity of actions pending against it with respect to its FX practices and disclosures.

7.      **Preliminary Approval.**

On October 15, 2004, this Court entered its Order Preliminarily Approving Class Action Settlement, Providing for Notice, Enjoining Prosecution of Released Claims, Allowing Intervention, and Allowing Discovery (the "Order").[15]  In so doing, the Court preliminarily found that the terms of the Settlement are "fair, adequate and reasonable as to the Settlement Class Members," and directed the parties to give notice to the Settlement Class preliminarily certified by the Court for settlement purposes only.  The Court approved the form and content of the class notice proposed by the parties, and found that the "mailing of the Mailed Notice and Claim Form, the distribution of the Publication Notice and the establishment of the Settlement Website and toll-free telephone number . . . meet the requirements of Federal Rule of Civil Procedure 23, and of due process, and constitute the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto."  The parties were ordered to give notice no later than January 13, 2005.  The deadline for opting out of or objecting to the Settlement was February 14, 2005.  The Court also scheduled the hearing on final approval for March 14, 2005; however, class members may submit claims up and including April 13, 2005.

---

[15] A modified Order was entered on October 29, 2004 to correct certain clerical errors.

8.      **Notice And Administration.**

American Express retained Rust Consulting, Inc. ("Rust") to administer the Settlement. See accompanying Declaration of Kim Schmidt ("Schmidt Decl."), ¶ 1. Notice was provided to the Settlement Class by both mail and publication in accordance with the terms of the Court's Order. Between January 11 and January 13, 2005, Rust caused the Class Notice to be mailed to 8,822,803 American Express cardmembers who are potential class members via first class mail, postage prepaid. Id., ¶ 5, Ex. A. The total cost of mailing the Class Notice was $3,111,522.00. Id. In addition, Rust supervised preparation of the layout of the "Summary Notice" in the form approved by the Court's Order. Id., ¶ 6. The Summary Notice was published on January 11, 2005. Id. A summary of the newspaper, publish date, and page numbers where the Summary Notice appeared is attached as Exhibit B to the Schmidt Declaration. The cost of the Summary Notice publication was $308,420.00. Id. Furthermore, Rust has established and maintains a toll-free telephone number (1-877-567-4294) to enable Settlement Class members to request copies of the Class Notice as well as to receive general information regarding the Settlement. Id., ¶ 7. This toll-free phone number was printed on the Class Notice and Summary Notice. Id. In addition, American Express has set up an Internet website – www.lipumasettlement.com – which contains information as to how class members may obtain copies of the Settlement Agreement, the Class Notice and Claim Form, and how class members may submit a claim form and other information regarding the Settlement and underlying litigation.

The estimated cost to complete processing of claim forms, exclusions, correspondence and other administrative costs related to settlement administration is $3,596,794.00. See Schmidt Decl., ¶ 9. Thus, the estimated total cost of notice, settlement administration and claims processing, excluding any subsequent distribution costs, all of which are being paid by American Express as part of the settlement consideration, is $7,016,736.00. Id., ¶ 10. Furthermore, the estimated cost of implementing the disclosure changes negotiated in connection with the Settlement, including the negotiated modifications to cardmember billing statements, is approximately $2,500,000.00. See Clements Decl., ¶ 5.

9.    **Objections And Opt-Outs.**

To date, Rust has received 1,159 opt-out requests.  Schmidt Decl., ¶ 13.  American Express has received 40 objections to the settlement, 17 of which are pleading objections and 23 of which consist of letter objections from individual cardmembers.[16]  See accompanying Declaration of Sonia Hall ("Hall Decl."), ¶ 2.  Over half of the letter objections include comments favorable to American Express, while others object to the frivolity of the underlying suit.  Id.

For example:  Heinz Rosen objects to the Settlement because "the case is believed to be trivial because of the minimal injury, if any, caused to American Express customers and should never have been brought in the first place."  See id., ¶ 3, Ex. A.  John S. Biersteker, like many others, writes that this case and the Settlement "has the effect of the defendants paying 'protection money' being 'shaken down' by plaintiffs' lawyers."  See id., ¶ 4, Ex. B.

Other cardmembers expressly support American Express and attest to the adequacy of the disclosures relating to American Express' foreign currency conversion practices.  These same cardmembers recognize the value of the FX service offered by American Express and the fact that the conversion rates offered are better than other offered exchange rates:

Peter J. Connors writes:

> It seems unreasonable to me to believe that someone traveling abroad is not aware that there are charges for currency exchange.  In my thirty years of foreign travel I have experienced these charges **every** time I have exchanged currency.  In fact, it is my experience that the absolute best exchange rate I could get was by using my American Express card and paying the bill in U.S. dollars when I got my American Express bill. . . .  It seems that the only winners here will be the class action attorneys who no doubt will get an exorbitant fee for clogging up the court system by claiming that a reasonably intelligent adult did not understand that there are fees associated with currency exchange.

See id., ¶ 5, Ex. C.

Teresa Ridgeway writes:

> [I]t has been my experience in foreign countries that the fee charged by American Express (or other credit card companies) to convert currency is often less than he

---

[16]  American Express discusses the various grounds asserted in these objections in Section C.4 below.

foreign merchant would have charged to allow you to pay in your own domestic currency. In addition – you often receive a preferable exchange rate by using your American Express card. The convenience of being able to use a credit card and the protection it offers you in foreign countries - rather than attempting to carry foreign currency – is worth a great deal. Disclosed or not – I, as an a intelligent consumer – would assume I will pay something for those advantages. I don't expect someone else to look out for me in my daily life. And I don't expect anyone to give me something for nothing. Enough said – no wonder American Express denies any wrongdoing.

See id., ¶ 6, Ex. D.

Harry E. Korner writes:

Although it would personally benefit me to accept this allegation, in the name of justice I strongly object to it and therefore to the proposed settlement, as I consider that American Express has clearly disclosed its conversion practice in its Agreements, if a card holder accepted such agreement and used his/her card for charges in foreign currencies, they have no justified claims against American Express. Consequently, considering that American Express fully disclosed its foreign currency conversion practices in its agreements with Card Holders which were accepted by the latter by using their card, I consider that I have been treated fairly by American Express and that this class action lawsuit is frivolous and unwarranted, asking this court to dismiss it as well as the proposed settlement.

See id., ¶ 7, Ex. E.

Continuing this theme, Joseph B. Greenspan, M.D., states that "American Express has always been extremely helpful and fair to me when I traveled abroad, and used their credit cards." See id., ¶ 8, Ex. F. Robert Fuller similarly writes, "I'm always satisfied with how American Express handles foreign exchanges." See id., ¶ 9, Ex. G. Richard Heinecke has been more than satisfied with American Express' foreign currency conversion practices and states: "I have used an American Express card for many years and on several trips overseas and have found that the handling of the foreign exchange charges by American Express has been very satisfactory. It has been a very convenient way of handling expenses when on foreign travel. I did not find any instances of excess charges." See id., ¶ 10, Ex. H. Finally, citing the "whimsical" nature of the lawsuit, J. Rio Garrison forwarded a personal check for $100 to American Express "as a small, personal contribution in defense of this litigation suit." See id, ¶ 11, Ex. I. The check was graciously returned. Id.

10.     **Based On The Claim Volume Already Received By Rust, It Appears That No Portion Of The Settlement Fund Will Revert To American Express.**

Based on the number of claims submitted to date and the fact that claims may be submitted until April 13, 2005, it appears, subject to final calculation, that the entire $75,000,000.00 Settlement Fund will be exhausted and there will be no reversion to American Express. Through March 3, 2005, Rust has received 646,293 claim forms from class members, i.e., 7.3% of the 8,822,803 claim forms mailed to potential class members. See Schmidt Decl., ¶ 11. Because claims tend to be submitted by class members primarily at the beginning and end of the claims period, and mostly at the end, it is likely that another 500,000 claim forms will be submitted. See id., ¶ 14. Furthermore, because corporate accountholders are being permitted to submit claims on behalf of their employees and because corporate accounts often have thousands of employee cardmembers, corporate claims likely will be submitted late in the claims period. See id., ¶ 15.

The likelihood that the $75,000,000.00 Settlement Fund will be exhausted can be illustrated through simple mathematics. Assuming that all attorneys' fees are awarded, there will be $63,500,000.00 available for distribution to class members after payment of fees and the $500,000.00 initial charitable contribution. Furthermore, the Settlement provides that an additional charitable contribution of up to $2,500,000.00 is to be made from the fund if claims are insufficient to reach the "cap," meaning that only $61,000,000.00 need be claimed by class members to deny any reversion to American Express. Based on the approximate gross revenue generated by the 2% rate adjustment during the class period, it appears likely that the Settlement Fund will be exhausted based on the high number of claims submitted and the fact that claims will continue to be submitted through April 13, 2005. See Pearson Decl., ¶ 18. Thus, it is unlikely that American Express will receive any reversion.

## III. ARGUMENT.

### A.    STANDARD FOR SETTLEMENT APPROVAL.

In the class action context, any proposed settlement requires court approval. Fed. R. Civ. Proc. 23(e); see Piambino v. Bailey, 757 F.2d 1112, 1139-42 (11th Cir. 1985). In making this determination, a district court must find that the settlement is "fair, adequate and reasonable and is not the product of collusion between the parties." Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977);[17] Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984) (same). To this end, this Court should "review the proposed settlement in light of the strong judicial policy that favors settlement." In re Sunbeam Secs. Litig., 176 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001) (quoting Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 538 (S.D. Fla. 1988)). "Particularly in class action suits, there is an overriding public interest in favor of settlement." Cotton, 559 F.2d at 1331. Indeed, "[s]ettlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, [citation], and achieve the speedy resolution of justice, for a 'just result is often no more than an arbitrary point between competing notions of reasonableness.'" Behrens, 118 F.R.D. at 538 (citing In re Corrugated Container Antitrust Litigation, 659 F.2d 1322, 1225 (5th Cir. 1981)). Finally, the court's decision is informed by the "realization that compromise is the essence of settlement." Bennett, 737 F.2d at 986; see also United States v. City of Miami, 614 F.2d 1322, 1324 (5th Cir. 1980). "The law favors compromise in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations." Behrens, 118 F.R.D. at 543.

The Eleventh Circuit has stated that, in evaluating whether a proposed settlement is "fair, adequate and reasonable," district courts should examine the following six factors: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the

---

[17] Fifth Circuit decisions prior to October 1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

DEFENDANTS' BRIEF IN SUPPORT OF FINAL APPROVAL
Case No. 04-CV-20314 Altonaga/Bandstra

settlement; and (6) the stage of proceedings at which the settlement was achieved." <u>Bennett</u>, 737 F.2d at 986.

**B.     THE SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS THE PRODUCT OF INFORMED, ARM'S-LENGTH NEGOTIATIONS.**

In considering whether a settlement should be approved, a "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." <u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 396 F.3d 96, 116 (2d Cir. 2005) (citing Manual for Complex Litigation, Third, § 30.42 (1995)); <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 535 (3d Cir. 2004) (same) (citing <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 232 n.18 (3d Cir. 2001)). Indeed, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." <u>Officers for Justice v. Civil Service Comm'n</u>, 688 F.2d 615, 625 (9th Cir. 1982). "Determining the fairness of the settlement is left to the sound discretion of the trial court," <u>Bennett</u>, 737 F.2d at 986; and a "just result is often no more than an arbitrary point between competing notions of reasonableness." <u>In re Corrugated Container Antitrust Litig.</u>, 659 F.2d at 1325.

As detailed above, the Settlement before this Court resulted from two years of vigorous arms' length negotiations between American Express and several groups of experienced class action counsel. There has been extensive formal and informal discovery, including numerous depositions and interviews, the production of thousands of pages of documents, and voluminous written discovery responses. Indeed, the record before this Court is extraordinarily voluminous and more than adequate to permit an informed decision. There is no evidence whatsoever of fraud or collusion. Accordingly, the Settlement is presumptively fair, reasonable and adequate.

-24-

Any comparison by the Intervenors between the LiPuma Settlement and the settlement rejected in Reynolds v. Beneficial National Bank, 288 F.3d 277, 280-81 (7th Cir. 2002), strains credibility. In Reynolds, various objectors alleged that settlement negotiations actually occurred between plaintiffs' counsel and defendant Beneficial prior to filing of the class action suits. Reynolds, 288 F.3d at 280-81. In fact, the Reynolds court stated "[i]t is doubtful whether Prossnitz or Schwartz [plaintiffs' counsel] even had a client at this time; and certainly Harris [also plaintiffs' counsel] did not." Id. Indeed, "Schwartz [plaintiffs' counsel] later 'bought' a client from another lawyer, to whom she promised a $100,000 referral fee." Id. at 281. As a result, the Reynolds objectors contended that the settlement submitted for approval was the product of a "reverse auction," brokered by Beneficial with the most ineffectual class lawyers in order to preclude other similar claims asserted against Beneficial. Id.

Here, unlike the Reynolds action, the LiPuma Action was already pending and discovery already had been served before American Express contacted LiPuma's counsel to explore settlement. The Bildstein Action also already was pending and the court in that case had encouraged the parties to pursue settlement discussions in advance of his ruling on arbitration. Counsel in both the LiPuma and Bildstein Actions participated extensively in negotiating the Settlement. Moreover, the Settlement was not the product of a "reverse auction." As discussed above, settlement discussions in LiPuma commenced after the termination of settlement discussions in the ELF Action. American Express did not reveal to the LiPuma and Bildstein lawyers any of the offers exchanged in the ELF negotiations, and it did not have the lawyers in these cases bid against one another. See Pearson Decl., ¶ 12. Indeed, the ELF lawyers ultimately negotiated an enhancement to the Settlement. Also, unlike Reynolds, the parties here reached the settlement through vigorous and contentious negotiations.

Various objectors also make the claim that it somehow was "collusive" for American Express to comment on the draft-amended complaint in this case to ensure that all claims pending around the country were encompassed therein.[18] This ignores the undisputed fact that

---

[18] American Express did not, as certain objectors claim, draft an amended complaint.

DEFENDANTS' BRIEF IN SUPPORT OF FINAL APPROVAL
Case No. 04-CV-20314 Altonaga/Bandstra

the central settlement objective of American Express was to buy global peace, and that an amended complaint encompassing all claims was a critical component of the settlement consideration for which American Express agreed to make disclosure changes and pay more than $75,000,000.00 plus over $7,000,000.00 in costs. Indeed, it is well established that defendants properly may "insist upon amendments to the pleadings broadening the scope of the action prior to settlement, in an effort to 'cover everything' and insure that the settlement will in fact result in an end to litigation." Trotsky, 48 Cal. App. 3d at 147-48 (citing other authorities). There is absolutely no evidence of collusion here. To the contrary, the Settlement resulted from several rounds of extended negotiations between competent counsel after ample discovery had been taken. Accordingly, the Settlement should be finally approved.

**C.      THE SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE.**

**1.      The Settlement Should Be Approved Because The Claims Being Released Are Extremely Weak.**

The reasonableness of a settlement can be determined "only in light of the strength of the case presented by the plaintiffs." In re Agent Orange Product Liability Litig., 818 F.2d 145, 149-51 (2d Cir. 1987); accord Cotton, 559 F.2d at 1330. Indeed, "the strength of the plaintiffs' case on the merits balanced against the settlement offer, is generally regarded as the most important." See Armstrong v. Board of Sch. Dirs., 616 F.2d 305, 314 (7th Cir. 1980).

All of the claims to be released by the Settlement are based on the allegation that American Express does not adequately disclose its foreign currency conversion methodology. These allegations are simply untrue, and the claims therefore would fail on the merits were they to be litigated. Indeed, a similar lawsuit against MasterCard (brought by one of the lawyers who also has sued American Express) was dismissed by the United States District Court for the Southern District of New York for failure to state a claim. See Bildstein v. Mastercard Int'l Inc., 329 F. Supp. 2d 410 (S.D.N.Y. 2004).

-26-

**a.** **American Express' Foreign Currency Conversion Disclosures And Practices Are Not Actionable Because American Express Sufficiently Discloses Its Rate-Setting Methodology And No Claim Lies Based On The Spread.**

As discussed, the drumbeat of FX litigation against American Express began shortly after the decision in Schwartz, which now is on appeal. While the Schwartz decision turned on the complete absence of disclosure of the 1% rate adjustment by Visa and MasterCard, American Express always has expressly disclosed its FX practices, including the 1-2% rate adjustment, in its cardmember agreements. As detailed above, American Express' cardmember agreements, which are provided to cardmembers before any charges are made, clearly state that "[i]f you initiate a transaction in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents at a rate set by us based on an interbank, tourist or (where required by law) official rate, increased in each instance by [1-2%]." (Emphasis added.) American Express cardmembers have loudly voiced their understanding of these express disclosures. See Hall Decl., Ex. E ("I consider that American Express has clearly disclosed its conversion practice in its Agreements, if a card holder accepted such agreement and used his/her card for charges in foreign currencies, they have no justified claims against American Express."); Ex. J ("It was clear and obvious to the most casual observer that there was an appropriate fee attached to the conversion of foreign funds."); Ex. G ("I knew there was a fee when I read my Card Holder agreement 16 years ago."). Indeed, even Intervenors' counsel have conceded adequate disclosure. See Pearson Decl., ¶ 19, Ex. D, at 26:15-16 (Mr. Caddell: "I knew they added 2 percent because I read my card member agreement); 48:1-4 (Mr. Stellings: "like Mr. Caddell, I knew that I was paying 2 percent for my foreign currency transactions.").

Because American Express expressly discloses its foreign currency conversion methodology, no cause of action can be maintained against American Express based on a failure to disclose. Put simply, there is nothing deceptive about a practice that is fully disclosed.

Indeed, as discussed above, cardmembers can determine the conversion rates used by American Express through simple math using information provided on their billing statements.

With respect to the Paul Intervenors' claims, American Express has denied and continues to deny all material allegations of the Paul Complaint, and maintains that the claims are entirely meritless. Moreover, the Paul claims are addressed by the Settlement's inclusion of specific compensation for cardmembers who charged in Turkish Lira. As to the practice allegedly at issue, not only is rounding a mathematical necessity in performing FX calculations, but Paul actually benefited from rounding because all of her transactions in Turkish Lira were rounded down. See Morlen Decl., ¶ 16. More importantly, Paul ignores the express terms of her agreement with American Express. See Clements Decl., Ex. E. Contrary to the Paul Intervenors' allegations, American Express does not represent to its cardmembers that it uses "the interbank exchange rate." Even when rounded, as required by mathematical necessity, the conversion rates used by American Express are "based on" interbank or other rates and therefore are permitted by the cardmember agreement.

The Intervenors further argue that American Express somehow has an obligation to disclose to cardmembers that it buys foreign currency at a better rate than it charges its cardmembers.[19] Tellingly, the Intervenors make no attempt to establish any legal basis for this claim, baldly asserting that "logic dictates" that their claims are "strong" and would "withstand scrutiny on the merits." Instead, the Intervenors focus entirely on the damages theoretically available under their legal theories, disregarding the essential issue of the merits.

The weakness of the Intervenors' theory is amply demonstrated by the recent decision of the Seventh Circuit in In re Mexico Money Transfer Litigation, 267 F.3d 743, 749 (7th Cir. 2001). In In re Mexico Money, plaintiffs claimed that defendants, two wire-transfer companies, fraudulently represented that patrons could wire $300 to Mexico for only $15 because defendants collected, in addition to the $15, the difference between the retail currency exchange rate quoted

---

[19] In fact, this is not always the case. American Express sometimes incurs losses from currency trading. See Morlen Decl., ¶ 5.

to customers and the wholesale interbank rate at which the defendants bought pesos on the foreign currency market.  Plaintiffs claimed that defendants were required to disclose the difference in foreign exchange rates (what the court termed the "FX spread"), or at least the price at which defendants bought pesos.  See id. at 745.  Evaluating plaintiffs' claim, in connection with a proposed settlement, the court reasoned that "the claims had only nuisance value" and that the settlement reached was "more in the nature of the PR gesture, coupled with a goal of freedom from a drumbeat of litigation" as similar suits had been filed in many state and federal courts across the nation.  See id. at 748-49.  Indeed, the court found that no state or federal law requires "either currency exchanges or wire-transfer firms to disclose the interbank rate at which they buy specie, as opposed to the retail rate at which they sell currency."  See id. at 749.

     The Ball Intervenors' claims are indistinguishable from the claims addressed skeptically by the Seventh Circuit.  They argue that no merchant should be entitled to profit from the sale of goods or services, whether foreign currency or gallons of milk, unless that merchant discloses the cost of acquiring those goods in addition to the retail price being charged.  This claim is completely frivolous, as recognized in In re Mexico Money:

> Money is just a commodity in an international market. [Citation.]  Pesos are for sale – at one price for those who buy in bulk (parcels at $5 million or more) and at another, higher price for those who buy at retail and must compensate the middlemen for the expense of holding an inventory, providing retail outlets, keeping records, ensuring that the recipient is the one designated by the sender, and so on.  Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars.  This is true in financial markets no less than markets for physical goods.  The customer of a bank's foreign-exchange section (or an airport's currency kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or their Internet to determine how must the bank has marked up its Swiss Francs or Indian Rupees.  The holder of a checking account may be promised a small interest rate (say, 2%) on the balance and is not told at what rate the bank lends these funds to its own customers.  Nor need the bank, or an intermediary such as MoneyGram, explain to customers how it profits from the float on funds it holds for a day or two between receipt and delivery.  MoneyGram and Western Union revealed truly, and separately, the exchange rate they offered (the price per peso) and the rate for the wire transfer to Mexico.  Each customer was told how many dollars in the United States would result in how many pesos delivered in Mexico.  Nothing in this transaction smacks of fraud, so the settlement cannot be attacked as too low.

Id. (emphasis added).  Indeed, as aptly recognized by the trial court, "the fact that Defendants obtain pesos themselves at a far more favorable rate is arguably not relevant to the consumer at all.  Nor is the wholesale rate paid by a retailer for any consumer product or service ordinarily disclosed to a consumer paying the retail price." In re Mexico Money Transfer Litig., 164 F. Supp. 2d 1002, 1015 (N.D. Ill. 2000).  Because the Ball Intervenors have no claim on the merits, evaluating the potential damages associated with such a tenuous claim does not advance this Court's inquiry into the fairness of the instant Settlement.

> **b.**    **American Express' Currency Conversion Practices Are Neither Unfair Nor Unconscionable; To The Contrary, Cardmembers Benefit From Using Their American Express Cards For Currency Conversion.**

Plaintiffs and Intervenors further base their claims on the false allegation that American Express' currency conversion rates are unconscionable, unfair and unlawful under applicable state law.  The well-established doctrine of unconscionability requires both: (i) a procedural element, involving evidence of "oppression" and "surprise" arising from an absence of meaningful choice; and (ii) a substantive element, involving evidence of overly-harsh or one-sided contractual terms.[20]

Here, because the FX practices were disclosed in the cardmember agreement, there is neither "oppression" nor "surprise."  Furthermore, the cardmember always possesses meaningful alternatives to using the card overseas, including by conducting foreign transactions with cash or traveler's checks.  Nor are the terms of the FX rates offered by American Express "overly harsh" or "one-sided" because the wholesale-based FX rates offered by American Express are favorable to the cardmembers and superior to alternative sources of currency conversion.

---

[20]   See, e.g., Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 255-56, 676 N.Y.S.2d 569 (1st Dept. 1998) (discussing unconscionability under New York law, as applicable pursuant to choice-of-law provision); Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 402 (Utah 1998) (Utah law, as applicable pursuant to choice-of-law provision in cardmember agreement); Dean Witter Reynolds, Inc. v. Superior Court, 211 Cal. App. 3d 758, 767 (1989) (unconscionability under California law); Stewart Agency, Inc. v. Robinson, 805 So.2d 726, 727 (Fla. 4th DCA 2003) (unconscionability under Florida law).

The FX rate adjustments applied by American Express and disclosed in the cardmember agreement are justified by the risks and costs borne by American Express in providing FX services and permitting its cards to be accepted abroad. Were this case to be litigated, American Express could demonstrate that there are substantial risks and costs associated with FX transactions, as well as substantial costs associated with maintaining foreign travel offices and a higher risk of chargebacks associated with foreign charges. Given the extreme complexity associated with FX operations, American Express is justified in making a profit. Accordingly, there is no procedural or substantive unconscionability, and all such claims fail.

     **c.**     **Cardmembers Are Not Harmed By American Express' Practices.**

Equitable considerations dictate that there must be an actual injury to support a claim for restitution or unjust enrichment. Here, American Express cardmembers receive exactly what they bargained for. Specifically, American Express expressly discloses its rate setting methodology in its cardmember agreement. Further, as discussed above, the conversion rates applied to cardmembers' foreign transactions are more favorable than marketplace alternatives. Put simply, cardmembers have suffered no compensable harm and could not recover even if liability somehow were established.

     **d.**     **The Arbitration Provision Precludes Recovery On A Class Basis.**

Certification of a class in any of the pending FX litigations, including the instant action, would not be tenable because, among other reasons, all cardmembers are subject to the Arbitration Provision contained in their cardmember agreements. As detailed above, since April 1999, American Express' cardmember agreements have included an Arbitration Provision applying to "any claim, dispute or controversy between you and us arising from or relating to the Cardmember Agreement . . . . [and] includes claims of every kind and nature, including but not limited to . . . claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity," and providing that the term "Claim" "is to be given the broadest possible meaning." The Arbitration Provision limits a cardmember's ability "to participate in a representative capacity or as a member of any class of claimants pertaining to any

-31-

claim subject to arbitration." The Arbitration Provision is clear and conspicuous, with portions emphasized in capital letters. Further, the American Express Centurion Bank cardmember agreements provide that they are "governed by the laws of the State of Utah and applicable federal law." The American Express Travel Related Services Company, Inc. cardmember agreements provide that they are "governed by the laws of the State of New York and applicable federal law."

The Arbitration Provision is valid and enforceable under New York law, Utah law and federal law. New York courts consistently uphold arbitration agreements in credit card and other consumer agreements, like the Arbitration Provision here. See, e.g., Tsadilas v. Providian Nat'l Bank, 13 A.D.3d 190, 786 N.Y.S.2d 478 (N.Y.A.D. 1 Dept. 2004) (holding that arbitration agreement in credit card agreement was enforceable "even though it waives plaintiff's right to bring a class action"); Johnson v. Chase Manhattan Bank USA, N.A., 2004 WL 413213, at *4-8 (N.Y. Sup. Feb. 27, 2004) (holding arbitration provision in credit card agreement was enforceable against class action claims); Ranieri v. Bell Atlantic Mobile, Inc., 304 A.D.2d 353, 759 N.Y.S.2d 448 (N.Y. App. 1st Dept. 2003) ("[W]e are in accord with authorities holding that a contractual proscription against class actions, such as contained in the [arbitration] Agreements, is neither unconscionable nor violative of public policy." (citing numerous authorities)); Brower, 246 A.D. 2d at 252 (holding that a consumer arbitration agreement relating to the purchase of computer equipment was validly formed and enforceable). Utah courts similarly have a strong policy favoring arbitration. See Central Fla. Investments, Inc. v. Parkwest Assocs., 40 P.3d 599, 606 (Utah 2002) ("'It is the policy of the law in Utah to interpret contracts in favor of arbitration . . . .'"(citation omitted)); Chandler v. Blue Cross Blue Shield, 833 P.2d 356, 358 (Utah 1992) (recognizing Utah's "strong policy in favor of arbitration"); Utah Code Ann. § 78-31a-107 (2003).

Further, Section 2 of the Federal Arbitration Act ("FAA") specifically provides that binding arbitration provisions in contracts "evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at

-32-

law or in equity for the revocation of any contract." 9 U.S.C. § 2. It is well settled that the FAA applies in both federal and state courts. See Southland Corp. v. Keating, 465 U.S. 1, 12, 104 S. Ct. 852 (1984) ("Federal law in the terms of the [FAA] governs . . . in either state or federal court"). Moreover, the United States Supreme Court has made clear that the FAA is extremely broad and applies to any transaction directly or indirectly affecting interstate commerce. See, e.g., Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995) (holding that the FAA applied to a lifetime termite protection contract between an Alabama homeowner and a multi-state termite protection company and stating that Section 2 of the FAA "signals an intent to exercise Congress' commerce power to the full").

The United States Supreme Court, and other courts following its clear direction, routinely enforce arbitration provisions contained in standard form contracts, including consumer transactions of all types. See, e.g., Green Tree Fin. Corp.-Ala. v. Bazzle, 539 U.S. 444, 123 S. Ct. 2402 (2003) (home improvement contract); Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 89-92, 121 S. Ct. 513 (2000) (finance contract for purchase of mobile home); Allied-Bruce Terminix, 513 U.S. at 282 (termite protection contract); Jenkins v. First Am. Cash Advance of Georgia, __ F.3d __, 2005 WL 388269 (11th Cir. Feb. 18, 2005) (payday loan agreement); Sydnor v. Conseco Fin. Serv. Corp., 252 F.3d 302, 306 (4th Cir. 2001) (home improvement loan contact); Johnson v. West Suburban Bank, 225 F.3d 366, 369 (3d Cir. 2000) (consumer lending agreement). Indeed, in addition to those cases referenced above, numerous federal and state courts have routinely enforced arbitration provisions in credit card agreements, like the Arbitration Provision here, including in FX litigation. See, e.g., In Re Currency Conversion Fee Litig., 265 F. Supp. 2d 385, 400-416 (S.D.N.Y. 2003) (enforcing arbitration provisions in credit card agreements under the FAA in action challenging FX policies); Hutcherson v. Sears Roebuck & Co., 342 Ill. App. 3d 109, 793 N.E.2d 886 (1st Dist. 2003); Vigil v. Sears Nat'l Bank, 205 F. Supp. 2d 566, 568 (E.D. La. 2002) (enforcing arbitration agreement in credit card agreement); Hale v. First USA Bank, N.A., 2001 WL 687371, *7-8 (S.D.N.Y. 2001) (same); Bank One, N.A., v. Coates, 125 F. Supp. 2d 819, 831-33 (S.D. Miss.

-33-

2001), aff'd. 34 Fed. App. 964 (5th Cir. Miss. 2002) (same); Marsh v. First USA Bank, N.A.,
103 F. Supp. 2d 909, 912 (N.D. Tex. 2000) (same); Goetsch v. Shell Oil Co., 197 F.R.D. 574,
578 (W.D.N.C. 2000).  Simply put, the Arbitration Provision precludes any of the multiple
pending foreign currency conversion lawsuits from going forward on a class action basis, as
already determined by an Illinois state court in Wick, one of the pending FX lawsuits.

**2.**      **The Settlement Should Be Approved Because The Settlement Falls Within
         The Range Of Reasonableness.**

Under the Bennett test, the second and third prongs – the range of possible recovery and
the point on or below that range at which a settlement is fair, adequate and reasonable – "are
easily combined." Behrens, 118 F.R.D. at 541.  When strong defenses to the claims at issue
exist, a low recovery is reasonable. See, e.g., Bennett, 737 F.2d at 986; Behrens, 118 F.R.D. at
542 ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a
single percent of the potential recovery.").  As in every settlement, an evaluation of the costs and
benefits of settlement must be tempered by a recognition that any compromise involves
concessions on the part of all of the settling parties.  Indeed, "the very essence of settlement is
compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" Officers for Justice
v. Civil Serv. Comm'n, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

**a.**      **The Settlement Consideration Is Substantial Compared To The
         Weakness Of The Claims Being Released.**

It is self-evident that the $75,000,000.00 Settlement Fund, plus the over $7,000,000.00 in
notice and administration costs being paid by American Express, is substantial monetary
consideration for the Settlement.  Furthermore, and critically, American Express has agreed to
make significant disclosure changes which, in addition to their substantial value as injunctive
relief, will cost American Express approximately $2,500,000.00.  Given the nuisance value of

-34-

the claims being released, this substantial equitable and monetary consideration for the Settlement falls well within the range of reasonableness.[21]

Importantly, the so-called "2% claim" is not the only claim which American Express bargained to release. While claim amounts are based on this 2% amount to provide a convenient methodology for allocating the proceeds of the Settlement, American Express did not and never would agree to pay 100% of the value of a claim it believes to be meritless. Rather, it agreed to provide substantial equitable and monetary consideration in exchange for global peace with respect to FX litigation. This consideration falls well within the range of reasonableness given the weakness of the claims being asserted.[22]

        **b.**        **Claims Received To Date Confirm That There Will Be No Reversion To American Express And That The Claims Process Was Fair.**

The Intervenors' claim that the $75,000,000.00 settlement amount is illusory because the total claims that will be submitted will fall below the $30,000,000 minimum settlement amount is completely untrue. Indeed, as discussed above, the number of claims received already is sufficient to exhaust the Settlement Fund, and class members have until April 13, 2005 to submit claims.

Furthermore, the contention that American Express has failed to demonstrate that a "direct-credit" settlement is impractical is no basis for denying final approval. Not only is no authority cited for this proposition, but the fact is that American Express would not agree to settle without a claims process. Furthermore, as set forth in deposition testimony obtained by the Intervenors, there would be substantial burden associated with a "direct credit" settlement:

---

[21] Indeed, at least with respect to the so-called "2% claim," the Intervenors agree that the settlement consideration is far greater than warranted by the merits. In this regard, Intervenors' counsel Michael Caddell conceded to this Court that "I think these lawyers did a terrific job in dealing with [the 2%] issue. Frankly, they did a better job, I would have imagined, given the fact that I knew they added 2 percent because I read my card member agreement. John Caddell also knew they added 2 percent." See Pearson Decl., ¶ 19, Ex. D at 26:13-19 (Status Conference Hearing Transcript dated Sept. 17, 2004).

[22] Notably, class action damages under the federal Truth in Lending Act are limited to $500,000.00. See 15 U.S.C. § 1640(a)(2)(B).

Well, as we discussed in January, for those who were there, the actual direct crediting, you know, posting a credit to a card member's account is not a complicated matter. What's complicated is figuring out how much. And the process by which one might attempt to determine that would require writing programs to extract and read the data in the FINCAP reports, which – and again, I'm not a technical person so bear with me as I describe the process. But it involves, first of all, having a program that is able to convert a report, which is not a data base – it's a report – into a machine-readable format – and don't press me on the technical part of that – and then going through the thousands and thousands and thousands of reports that there, are to read them one by one and read each transaction on them one by one and then extract that and put it somewhere so that one could perform some analysis on it. And I don't have any idea of the actual number of these reports, but every transmission that comes in from ever part of the world in the course of the day and the week, you know, creates reports like this. So the volume would be considerable. And – but once having gone through that process, then presumably one would have a record, albeit a relatively truncated or minimal record, of each foreign currency transaction on a US card member's account. With considerable effort, one could write programs presumably to analyze those data and reformat them and organize them, and I guess add additional data to them because, as we discussed, they're very sparse as it is, about the card member and their account, and organize them by card member account, I guess, and attempt in that way to calculate an amount of foreign currency transactions on an individual card member's account.

See Pearson Decl., ¶ 20, Ex. E (October 5, 2004 Deposition of Gillen Clements, 19:7-20:16).

Moreover, the large number of claims submitted confirms that cardmembers are well aware of their rights and have in fact taken full advantage. As reflected by the numerous letters submitted in support of American Express, many class members do not believe they were injured in any way and have no interest in seeking refunds. Thus, class members who wish to recover are able to do so, while those who disapprove of nuisance class action settlements are free to decline.[23]

Put simply, there is nothing wrong with the structure of the Settlement, and it is fair, reasonable and adequate.

---

[23] See Hall Decl., Ex. E ("Although it would personally benefit me to accept this allegation, in the name of justice I strongly object to it and therefore to the proposed settlement, as I consider that American Express has clearly disclosed its conversion practice in its Agreements, if a card holder accepted such agreement and used his/her card for charges in foreign currencies, they have no justified claims against American Express."); Ex. C ("In any case I would ask that any portion of the settlement that belongs to me be returned to American Express as a token of my support.").

### c.    The Intervenors' Argument That Their Claims Must Be Valued Separately Is Contrary To Well-Established Law.

Intervenors argue that it is not possible to fix a range of possible recovery here because they have been unable to quantify the value of their claims. This is not true. As discussed above, there has been substantial discovery regarding all aspects of American Express' FX practices, including with respect to the "competitive adjustments" and American Express' practices in covering its currency positions. More importantly, as recently recognized by the Second Circuit in Wal-Mart, this Court need not engage in a claim-by-claim, dollar-by-dollar evaluation to approve the Settlement.

In Wal-Mart, the appellants, like the Intervenors here, were pursuing other cases that would be affected by the proposed settlement, and argued that their interests were inadequately represented and pursued during settlement negotiations. Wal-Mart, 396 F.3d at 112-13. Furthermore, the appellants argued that (i) the "adequacy of representation doctrine" requires "settled claims of absent class members [be] adequately represented as a matter of fact" before they can be released and (ii) the damages sought by the settlement differed from the damages that could be sought based upon appellants' claims and legal theories. Id. at 109-10. Respondents (class plaintiffs) countered that these arguments amounted to nothing more than baseless allegations that the plaintiffs "left significant claims on the table." Id.

The Second Circuit rejected appellants' arguments, recognizing the "well established" law that "class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." Id. at 106. Indeed, "class action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." Id. at 109 (citing In re Lloyd's Am. Trust Fund Litig., No. 96 Civ. 1262, 2002 WL 31663577 at *11 (S.D.N.Y. Nov. 26, 2002)). In this respect, "[a]dequate representation is not solely an assessment of effort;" rather, the Court must examine the interests

-37-

of the settling parties and the settlement's effect on those who would be bound by the settlement. Id. at 110.

Here, as American Express has repeatedly maintained, the principal focus of this Settlement was to resolve all of the numerous FX litigations pending against it around the country. At the heart of each of these cases is the claim that American Express has engaged in FX practices that are inadequately disclosed. It is completely appropriate, and in accord with the strong public policy in favor of settlements of complex disputes, to settle these claims on a global basis. "Practically speaking, '[c]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.'" See Wal-Mart, 396 F.3d at 106 (citing Stephenson v. Dow Chem. Co., 273 F.3d 249, 254 (2d Cir. 2001)).

As in Wal-Mart, Intervenors merely contend that class counsel "left significant claims on the table," an argument that should be soundly rejected. "Plaintiffs in a class action may release claims that were or could have been pled in exchange for settlement relief" (Wal-Mart, 396 F.3d at 106), because "[a]dequate representation of a particular claim is established mainly by showing an alignment of interests between class members, not by proving vigorous pursuit of that claim." Id. at 106-07 (emphasis supplied).

All said, given the nuisance value of the claims at issue, and the fact that the Settlement gives all class members an immediate and concrete opportunity to share in a large monetary sum and to benefit from significant disclosure changes, the proposed Settlement falls well within the range of what is fair, adequate and reasonable.

### 3.   The Complexity, Expense And Duration Of Litigation, As Well As The Stage At Which Settlement Was Achieved, All Favor Final Approval.

Based on the number of FX cases pending, with the potential for more to be filed, American Express laudably pursued settlement of any and all FX claims early on in the litigations. It is axiomatic that "courts favor the pursuit of early settlement." In re Vitamins Antitrust Litig., 2000 WL 1737867, at *3 (D.D.C. Mar. 31, 2000); accord In re M.D.C. Holdings Sec. Litig., 1990 WL 454747, at *7 (S.D. Cal. Aug. 30, 1990) ("Early settlements benefit

-38-

everyone involved in the process and everything that can be done to encourage such settlements - especially in complex class action cases – should be done."); In re NLO, Inc., 5 F.3d 154, 157 (6th Cir. 1993) (noting that "judges should encourage and aid early settlement"). Thus, the fact that this Settlement occurred at a relatively early stage in the litigations is beneficial, not detrimental. This is particularly true here where continued prosecution of the FX claims likely will not succeed in securing a similar benefit. See, e.g., In re Mexico Money Transfer Litig., 267 F.3d at 749; Sanchez v. Giromex, Inc., JCCP No. 4159, 2004 WL 2750332 (Cal. App. 4 Dist.) (Dec. 4, 2004); Bildstein v. Mastercard Int'l Inc., 329 F. Supp. 2d 410 (D.C.N.Y. 2004). Furthermore, given the breadth of discovery taken to date and length and number of negotiations to date, "the case has progressed to a point where each side [is] well aware of the other side's position and the merits thereof." In re Sunbeam Secs. Litig., 176 F. Supp. 2d 1323, 1332 (S.D. Fla. 2001). These factors weigh in favor of this Court finding the Settlement to be fair, adequate and reasonable.

**4.      The Low Number Of Objectors And Significant Number Of Class Members Writing To Support American Express Favor Final Approval**

The reaction of class to the settlement is an important factor in determining whether the settlement is fair, reasonable and adequate. Wal-Mart, 396 F.3d at 117, 118. A low percentage of objections confirms the reasonableness of a settlement and supports its approval. See, e.g., id. at 118 (approving settlement where only 18 class members out of five million objected); Stoetzner v. United States Steel Corp., 897 F.2d 115, 118-19 (3d Cir. 1990) (approving settlement when 29 out of 281 class members objected); Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974) (settlement approved over objection of 20 out of 14,156 claimants).

There have been only 40 objections to the Settlement (23 of which are letter objections from individual cardmembers and 17 of which are pleading objections), which constitute a miniscule .00045% of the 8,822,803 notices mailed. As discussed above, over half of the letter "objections" actually offer statements supporting American Express and its FX practices and asserting that the lawsuit is meritless. See Hall Decl., ¶ 2. Furthermore, over 640,000 class

-39-

members have filed claims to date, with the claim cut-off period yet to expire (April 14, 2005). In contrast, only 1,159 (.013% of the potential class) have opted out. See Schmidt Decl., ¶ 13. See In re Toys "R" Us Antitrust Litig., 191 F.R.D. 347, 355 (E.D.N.Y. 2000) (approving Settlement based on small number of opt outs and objections given "the huge number of potential Class members and the massive nationwide notice"). Simply put, the overwhelming support for this Settlement and virtually nonexistent opposition are a testament to its fairness.

## D.   THE OBJECTIONS TO THE SETTLEMENT ARE MERITLESS.

The relative handful of objections to the Settlement, which are discussed by subject due to their overlapping arguments, provide no basis for denying final approval.[24]

### 1.   The Release Is Valid Based On The Claims Being Settled.

Intervenors (and certain objectors) argue that the release in the Settlement is overbroad because it supposedly: (i) releases claims arising from different facts (see Intervenors' Objections); (ii) releases all state law causes of action for deceptive trade practices without compensating class members for the release of those claims (see, e.g., Objections of Jason Creamer and Joan Jannick); and (iii) permits American Express to charge its cardholders any rate it chooses, so long as the methodology is disclosed in the applicable card agreement (see, e.g., Objections of David T. Murray and Murray and Associates, P.C. and Joseph C. Hawthorne). All of these objections must be rejected.

Contrary to the Intervenors' assertions, all of the claims being settled here arise from the same "factual predicate" – the conversion of foreign currency transactions into U.S. Dollars for billing purposes and the allegedly inadequate disclosure thereof. It is the general rule that "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country." Wal-Mart, 396 F.3d at 106. "Practically speaking, [c]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability." Id. (citation

---

[24] American Express understands that objections filed by two corporate accountholders, Bridgestone/Firestone and The Lubrizol Corporation, will be withdrawn shortly. Accordingly, they are not addressed herein.

DEFENDANTS' BRIEF IN SUPPORT OF FINAL APPROVAL
Case No. 04-CV-20314 Altonaga/Bandstra

omitted).  To that end, "a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason or in connection with any matter or fact set forth or referred to in the complaint."  In re Corrugated Container Antitrust Litig., 643 F.2d 195, 221 (5th Cir. 1981).  Such claims may be released when "conduct arises out of the 'identical factual predicate' as the settled conduct."  Wal-Mart, supra, at 107 (citing TBK Partners, Ltd. v. W. Union Corp., 675 F.2d 456, 460 (2d Cir. 1982).

Here, all of the legal theories that could be asserted arise from the same underlying transactions – foreign charges by U.S. cardmembers – and all of the FX litigations, including Ball and Paul, arise from the alleged inadequacy of American Express' FX disclosures (notwithstanding that the FX practices are fully disclosed).  Plaintiffs LiPuma and Barrett represent a broad class of American Express cardmembers who incurred a charge denominated in foreign currency and paid that charge in U.S. dollars.  This lawsuit does not merely challenge the "2% fee," but also all of American Express' FX practices, including its rate-setting methodologies.[25]

Intervenors' reliance upon National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9 (2d Cir. 1981), and In re Auction Houses Antitrust Litig., 42 Fed. App. 511 (2d Cir. 2002), is unavailing.  In Super Spuds, a settlement was reached by plaintiffs who purchased certain liquidated futures contracts.  Although separate unliquidated futures contracts never were mentioned in the pleadings or the subject of discovery, and although the named plaintiffs had no such unliquidated contracts, the settlement provided for the release of claims relating to unliquidated contracts without consideration and without notice.  The Second Circuit appropriately held that such a settlement could not be fair when "a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated contract."  National Super Spuds, 660 F.2d at 19.

---

[25] See First Amended Complaint, ¶¶ 2 ("American Express also fails to adequately disclose the foreign currency conversion rates it applies to transactions."), 17 (alleging improper use of unilaterally determined and inadequately disclosed rates), 24 (alleging that consumers are harmed by lack of conversion rate information), 30(a) (alleging common course of conduct concerning methodology for setting rates), 40-41, 43, 48, 53, 55 & 58.

-41-

Similarly, in <u>Auction Houses</u>, plaintiffs (auction patrons) alleged that the defendant auction houses conspired to fix prices on <u>domestic</u> auctions.  The court refused to approve a settlement which proposed to release class members' rights to bring claims related to <u>foreign</u> auctions (which were not class claims) in United States courts.  Recognizing that such claims "were not within the description of claims assertable by the class," the district court reasoned that the "key point is that an expanded release requires the allocation of at least some of the settlement consideration to the holders of the claims prejudiced by the expansion."  <u>In re Auction Houses Antitrust Litig.</u>, No. 00 Civ. 0648(LAK), 2001 WL 170792, *12, 19 (S.D.N.Y. 2001).  As affirmed by the Second Circuit, impairment of the released (non class) claims, while slight, could not be "exacted without any compensation whatsoever."  <u>In re Auction Houses Antitrust Litig.</u>, 42 Fed. App. at 519.

Unlike in <u>Super Spuds</u> (contrasting liquidated vs. unliquidated futures contracts) and <u>Auction Houses</u> (contrasting domestic vs. foreign auctions), the claims released here do not involve different factual predicates, but are all based upon precisely the same transactions – the foreign charges made by U.S. cardmembers.  All plaintiffs and Intervenors challenge American Express' disclosure of its FX practices with respect to those transactions.  Moreover, while some of the class members in <u>Super Spuds</u> and <u>Auction Houses</u> did not receive any benefit for the release of their separate claims, in this case every class member will benefit from the substantial consideration being given in exchange for the release.  Furthermore, unlike the factually disparate claims assessed in <u>Super Spuds</u> and <u>Auction Houses</u>, American Express' FX practices and rate-setting methodologies have been challenged in the pleadings and have been the subject of discovery.  The claims targeted for release in <u>Super Spuds</u> and <u>Auction Houses</u>, on the other hand, encompassed distinct claims, which the class representatives in those cases had not pursued.

Intervenors' "factual predicate" argument assumes that the only consideration being paid here is the "2% fee."  But that assumption is contrary to logic and fact.  As discussed, the "2% fee" claim amount has no bearing on the breadth of the release, and it does not serve to limit or

-42-

define the nature of the claims released by the Settlement. Rather, it simply functions as an easily identifiable calculus for the monetary consideration provided as part of the Settlement, which also provides for meaningful disclosure changes, charitable contributions, and costs of notice and administration. Simply put, each American Express cardmember who incurred a charge denominated in foreign currency and paid that charge in U.S. dollars will receive consideration for the release of their claims. In this regard, the Eighth Circuit's recent analysis of the give-and-take nature of the settlement process is compelling:

> The release of [a particular] category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this [related] case has benefited, and a . . . procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things this is the way settlements work. It was the judgment of the class representative that [a particular category of claims], known and unknown, was a proper thing to give up to obtain the benefits offered by the [the defendant].

In re General Am. Life Ins. Co. Sales Practices Litig., 357 F.3d 800, 805 (8th Cir. 2004).

The scope of the release in this case, which is clearly set forth in the settlement notice, is based on the same underlying transactions and, therefore, the Intervenors' "factual predicate" argument simply does not apply. The release thus is not overbroad.

Arguments based on the release of state law deceptive trade practices claims also are groundless. As repeatedly noted above, the Settlement provides substantial equitable and monetary consideration in exchange for the bargained-for release. What is more, "adequate representation of a particular claim is determined by the alignment of interests of class members, not proof of vigorous pursuit of that claim." Wal-Mart, 396 F.3d at 113. As a result, objectors' contention that plaintiffs LiPuma and Barrett could not release all potential state law claims fails. Indeed, the Ninth Circuit Court of Appeals has found that the "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022-23 (9th Cir. 1998).

Finally, objections based on the contention that the release permits American Express to charge cardmembers any rate it chooses, so long as the methodology is disclosed in the applicable card agreement, carry no weight. The release is limited as to time and does not purport to regulate or sanctify American Express' FX practices, but rather, releases any and all claims that could be based upon such practices.[26] American Express' FX practices continue to be subject to the terms of the cardmember agreements and applicable law.

Accordingly, for all of the foregoing reasons, the release is not "overbroad."

## 2.     The Settlement Notice Is Proper.

Federal Rule of Civil Procedure 23(e) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." The purpose of class notice is "to give members of the class the opportunity to object to the proposed settlement." White v. State of Ala., 74 F.3d 1058, 1066 n.27 (11th Cir. 1996). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 2d 865 (1950). "The notice must be of such nature as reasonably to convey the required information, [citation], and it must afford a reasonable time for those interested to make their appearance." Id. The Eleventh Circuit adheres to these rules, but recognizes that "[i]t is not the function of the settlement notice to fully inform the class of all the details of the settlement, but merely to put class members on notice of the general parameters of the settlement and to inform them of where information as to specifics may be obtained." See Twigg v. Sears, Roebuck & Co., 153 F.3d 1222, 1227 (11th Cir. 1998).

The notice program for this Settlement, which previously was approved by this Court, easily satisfies these criteria. Individual class notices were mailed to 8,822,803 potential class

---

[26] The acknowledgement by class members that the new disclosures American Express has agreed to use are adequate is conditioned upon American Express' compliance with those disclosures.

-44-

members. See Schmidt Decl., ¶ 5.  Notice also was published in newspapers with an

approximate combined circulation of 9,501,726.[27]  The notice more than adequately informs

class members of:  (i) the nature of the litigation; (ii) the material terms of the Settlement; (iii)

their right to object or opt out and the procedures for doing so; and (iv) where they can obtain

further information regarding the litigation and the Settlement.  Nothing further is required.

Purportedly relying on National Super Spuds and Trotsky v. Los Angeles Fed. Sav. &

Loan Ass'n, 48 Cal. App. 3d 134, 121 Cal. Rptr. 637 (1975), Intervenors assert that the absence

of a reference in the settlement notice to the Ball and Paul Actions (and the claims asserted

therein) precludes final approval.[28]  They are wrong.  Indeed, other courts have found that

disclosure of other pending actions, even when the other actions have been certified as class

actions, is not necessary.  See, e.g., In re Corrugated Container Antitrust Litig., 643 F.2d at 224

(notice of pending certified class action was not required despite alleged superiority of relief

available in the alternative action), cert. denied, 456 U.S. 998, 102 S. Ct. 2283, 73 L. Ed. 2d

1294 (1982); Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1317-18 (3d Cir. 1993) (notice need not

describe other litigation or its relative merit); In re Prudential Ins. Co. of Am. Sales Practices

Litig., 962 F. Supp. 450, 529 (D.N.J. 1997) (same); Bowling v. Pfizer, Inc., 143 F.R.D. 141, 160-

61 (S.D. Ohio 1992).  The Super Spuds and Trotsky decisions are inapposite here because, as

discussed above, there is no difference in the factual bases for the claims asserted in LiPuma and

in Ball and Paul, or any of the ten pending FX litigations.  Indeed, the Second Circuit soundly

rejected this same argument in Wal-Mart, finding that the class notice was sufficient even though

it did not specifically inform class members that particular claims in other pending actions would

be released as part of the proposed settlement because the claims in both cases arose out of the

same factual predicate.  Wal-Mart, 396 F.3d at 114.

---

[27] See October 15, 2004 Order, Ex. 4 (schedule of publications).

[28] The Creamer objectors argue that the notice was invalid because it failed to provide potential
class members with information sufficient to decide whether to participate in or opt out of the
Settlement.  The objection asserts only that the notice failed to disclose to class members that
they would be releasing state law remedies.  As discussed herein, such disclosures are not
necessary.

Unlike this case, the claims in the <u>Trotsky</u> case were materially different from the claims in the other pending action (the "<u>Barwig</u>" case). <u>Trotsky</u> and <u>Barwig</u> both challenged certain provisions of a trust deed being used by the defendant mortgage lender. <u>See</u> <u>Trotsky</u>, 48 Cal. App. 3d at 139-40. However, the <u>Trotsky</u> case at the time of settlement only challenged clauses 9 and 12 of the trust deed, which permitted the lender to impose interest rate increases and late charges when the <u>borrower</u> makes late payments, while <u>Barwig</u> challenged clause 10, which permitted the lender to increase interest rates on mortgage loans when the <u>lender</u> increases interest rates on its savings accounts. <u>See</u> <u>id.</u> at 146-47. Although the <u>Trotsky</u> plaintiffs "were not, and did not claim to be, adequate class representatives of those borrowers having claims against [the lender] arising out of clause 10," and although the operative complaint in <u>Trotsky</u> "made no allegations whatsoever with respect to the validity of clause 10," the settlement in <u>Trotsky</u> purported to release clause 10 claims. <u>See</u> <u>id.</u> at 146-47. As the <u>Trotsky</u> court explained, it was for this reason that notice of the <u>Barwig</u> action was required:

> [T]he existence of another purported class action <u>relating to clause 10</u> would have been highly significant to the members of the temporary [<u>Trotsky</u> settlement] class in deciding whether they should object to the Trotsky settlement or request exclusion from the class. <u>Given notice that the Barwig case also involved clause 10</u>, class members would have had a powerful incentive to investigate to determine whether the Trotskys or appellant <u>better represented</u> their interests.

<u>See</u> <u>id.</u> at 152 (emphasis added).

Here, unlike in <u>Trotsky</u> or <u>Super Spuds</u>, there is no difference in the factual bases for the claims asserted in <u>LiPuma</u> and any of the other pending FX litigations. More importantly, as detailed above, no claims are being released without compensation. The notice fully provides class members the opportunity to decide whether to release their claims.

**3.      Plaintiffs LiPuma And Barrett And Their Counsel Adequately Have Represented The Class.**

"Adequate representation of a particular claim is established mainly by showing an alignment of interests between class members, not by proving vigorous pursuit of that claim."

-46-

Wal-Mart, 396 F.3d at 106-07.  Here, the Settlement Class is represented by competent and experienced litigation counsel who vigorously pursued a large and favorable settlement.

### 4.      No Conflicts Exist Between Class Members.

Certain objectors claim that the Settlement unfairly discriminates against class members who opened or closed their accounts prior to February 1, 1999.  Objectors argue that recovery for these class members should not be limited to a flat amount of $15, and that this flat amount constitutes an intra-class conflict between those class members permitted to claim 100% of their FX amounts and those limited to $15.  These objectors argue that any class member who produces documentation of amounts charged in foreign currencies prior to February 1, 1999 should be permitted to file a claim for 100% of any FX amounts paid.  This objection is groundless.

"Naturally, the settlement does not provide for a full recovery of legal damages; but that is the hallmark of compromise."  In re PaineWebber Ltd. Partnerships Litigation, 171 F.R.D. 104, 131 (S.D.N.Y.,1997).  Indeed, "there is no rule that settlements benefit all class members equally," as long as the settlement terms are "rationally based on legitimate considerations."  In re Agent Orange Product Liability Litig., 611 F. Supp. 1396, 1411 (E.D.N.Y.1985) (citing Holmes v. Continental Can Co., 706 F.2d 1144, 1148 (11th Cir. 1983)); see also Petrovic v. AMOCO Oil Co., 200 F.3d 1140, 1146 (8th Cir. 1999);[29] Follansbee v. Discover Financial Servs., Inc., Case No. 99 C 3827, 2000 WL 804690 (N.D. Ill. 2000) ("distinctions in the damages awarded to different subclasses are no uncommon and will not defeat a class settlement so long as the distinctions are supported by a rational basis"); UHL v. Thoroughbred Tech. & Telecomms., Inc., Case No. IP 00-1232-C B/S, 2001 U.S. Dist. LEXIS 13115, 50-51 (S.D. Ind.

---

[29] "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person (i.e., a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would)." Petrovic, 200 F.3d at 1146

2001) (approving proposed class settlement as "fair and reasonable" and rejecting argument that "awarding differing compensation to two groups with the class is inherently unfair"). Moreover, "the applicable standard for approval is whether the settlement is fair, reasonable and adequate, not whether it is perfect, or whether every Class Member receives an identical recovery." In re PaineWebber, 171 F.R.D. at 131 (approving proposed settlement over objection that settlement was unfair because class members were treated differently with regard to award amounts).

     As set forth in the Settlement Agreement, American Express does not have readily accessible account-specific data or records regarding amounts paid by cardmembers in respect to individual FX transactions prior to February 1, 1999 – claims that would be stale and barred in many jurisdictions. As a result, the parties negotiated and agreed upon a reasonable settlement amount, which is based on other available data. Indeed, "compromise is the essence of settlement" (Bennett, 737 F.2d at 986), and objectors' arguments amount to a claim that objectors would have brokered a better settlement than Class Counsel. Irrespective of this contention, the fact remains an estimated distribution formula or award is appropriate when records are not available to determine "an exact distribution formula." Spencer v. Peat, Marwick, Mitchell & Co., Case No. Civ 4-84-794, 1986 WL 15155 (D. Minn. 1986). Accordingly, objectors' arguments fail.

### IV. CONCLUSION.

     Based on the foregoing, American Express respectfully requests that the Settlement be finally approved.

Dated:  March 4, 2005

STROOCK & STROOCK & LAVAN LLP
Counsel for Defendants
200 South Biscayne Boulevard
3160 Wachovia Financial Center
Miami, Florida 33131-5323
Telephone:  (305) 358-9900
Facsimile:  (305) 789-9302

By: _____
      Richard E. Landman
      (Florida Bar No. 149713)
      Rlandman@Stroock.com

-48-

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by U.S. mail (except to Plaintiffs' and Intervenors' counsel via Federal Express) on this 4th day of March, 2005 on the following Service List.

Richard E. Landman

## SERVICE LIST

**Bruce E. Gerstein, Esq.**
**Kevin Landau, Esq.**
Garwin, Bronzaft, Gerstein & Fisher, LLP
1501 Broadway, Room 1416
New York, NY 10036
Fax: 212-764-6620
*Attorneys for Plaintiff Edward Lipuma*

**Adam M. Moskowitz, Esq.**
**Thomas A. Tucker Ronzetti, Esq.**
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, FL 33134
Fax: 305-372-3508
*Attorneys for Plaintiffs*

**Allan Steyer, Esq.**
**D. Scott Macrae, Esq.**
Steyer, Lowenthal Boodrookas Alvarez &
  Smith LLP
One California Street, Third Floor
San Francisco, CA 94111
Fax: 415-421-2234
*Attorneys for William Barrett*

**Frank J. Janecek, Jr., Esq.**
**Bonny E. Sweeney, Esq.**
**Christopher M. Burke, Esq.**
Lerach Coughlin Stoia Geller Rudman &
Robbins, LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
Fax: 619-231-7423
*Attorneys for William Barrett*

**Norman A. Moscowitz, Esq.**
Moscowitz Moscowitz & Magolnick, P.A.
1111 Brickell Avenue, Suite 2050
Miami, FL 33131
Fax: 305-379-4404
*Attorneys for William Barrett*

**Scott R. Shepherd, Esq.**
Shepherd Finkelman Miller & Shah LLC
4400 North Federal Highway
Lighthouse Point, FL 33064
Fax: 954-943-9173
*Attorneys for Plaintiffs and the Class*

**Paul M. Weiss, Esq.**
**William M. Sweetnam, Esq.**
**Jonathan B. Piper, Esq.**
Freed & Weiss LLC
111 West Washington Street, Suite 1331
Chicago, IL  60602
Fax: 312-220-7777
*Attorneys Luis Fuentes*

**Cynthia Chapman, Esq.**
**Cory S. Fein, Esq.**
**Michael A. Caddell, Esq.**
Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 71370
Fax: 713-751-0906
*Attorneys for Paul Intervenors*

**Daniel C. Girard, Esq.**
**A. J. DeBartolomeo, Esq.**
**Sanjay M. Ranchod, Esq.**
Girard Gibbs & DeBartolomeo
601 California Street, Suite 1400
San Francisco, CA  94108
Fax: 415-981-4846
*Attorneys for Paul Intervenors*

**David S. Stellings, Esq.**
**Caryn Becker, Esq.**
Lieff, Cabraser, Heimann & Bernstein, LLP
780 Third Avenue, 48th Floor
New York, NY  10017
Fax: 212-355-9592
*Attorneys for Ball Intervenors*

**Thomas F. Schrag, Esq.**
**James S. Baum, Esq.**
Schrag & Baum, P.C.
280 Panoramic Way
Berkeley, CA  94704
Fax: 510-841-6050
*Attorneys for William Barrett*

**Dennis Stewart, Esq.**
Hulett Harper Stewart, LLP
550 West C Street, Suite 1600
San Diego, CA  92101
Fax: 619-338-1133
*Attorneys for William Barrett*

SSL-MIA1 30114440v3

Service List for Objectors

| | |
|---|---|
| Frank E. Geraghty, Esq.<br>Thomas M. Dougherty, Esq.<br>2225 First Street<br>Fort Myers, FL 33901<br><br>Christopher W. Byron, Esq.<br>BYRON GERBER PETRI & KALB LLC<br>241 North Main Street<br>Edwardsville, IL 62025<br><br>Michael G. Crow, Esq.<br>The Crow Law Firm, LLC<br>1100 Poydras Street, Suite 1175<br>New Orleans, LA 70163 | *Counsel for Objectors Edward McNamara and Barbara Geraghty* |
| Richard H. Critchlow, Esq.<br>Christina Ceballos-Levy, Esq.<br>KENNY NACHWALTER, P.A.<br>Miami Center – Suite 1100<br>201 South Biscayne Boulevard<br>Miami, FL 33131 | *Counsel for Objector Bridgestone/Firestone North American Tire, LLC* |
| Nicholas Fausto, Esq.<br>671 Stokes Road<br>Suite 4-150<br>Medford, NJ 08055 | *Counsel for Objector DM Delluomo, Inc.* |
| Manuel A. Garcia-Linares, Esq.<br>RICHMAN GREER WEIL BRUMBAUGH<br>        MIABITO & CHRISTENSEN, P.A.<br>Miami Center – 10th Floor<br>201 S. Biscayne Boulevard<br>Miami, FL 33131 | *Counsel for objectors The Lubrizol Corporation and Noveon, Inc.* |
| Arturo Alfonso, Esq.<br>Law Offices of Arturo Alfonso<br>Suite 125<br>7821 Coral Way<br>Miami, FL 33155<br><br>Bryan D. Marcus, Esq.<br>BRYAN D. MARCUS, P.C.<br>26400 Lasher Road<br>Suite 215<br>Southfield, MU 48034 | *Counsel for objectors Randy Roses, Lloyd Zander and Mary Ellen Zander* |

| | |
|---|---|
| Catherine Hite, Esq.<br>CATHERINE HITE, P.A.<br>799 Brickell Plaza, Suite 700<br>Miami, FL 33131<br><br>John J. Pentz, III, Esq.<br>2 Clock Tower Place, Suite 260G<br>Maynard, MA 01754 | *Counsel for David T. Murray, Murray &*<br>*Associates, P.C. and Joseph Hawthorn* |
| Michael A. Gonzalez, Esq.<br>DeMahy Labrador Drake & Payne, P.A.<br>2333 Ponce de Leon Road<br>The Colonnade, Suite 600<br>Coral Gables, FL 33134<br><br>Paul D. Kamenar, Esq.<br>Washington Legal Foundation<br>2009 Massachusetts Avenue, N.W.<br>Washington, DC 20036 | *Counsel for objector Clayton Robert*<br>*Barker, III* |
| Kearney Dee Hustler, Esq.<br>3620 8th Avenue South<br>Birmingham, AL 35222<br><br>Michael J. McHale, Esq.<br>1925 Northeast Ricou Terrace<br>Jensen, FL 34957 | *Counsel for objector Dee J. Brasfield, III* |
| Raul E. Garcia, Jr. Esq.<br>LAW OFFICES OF RAUL E. GARCIA, JR.<br>Dadeland Towers North, Suite 316<br>9200 South Dadeland Blvd.<br>Miami, FL 33156<br><br>THOMPSON ♦ BOGRÁN<br>Roy B. Thompson, Esq.<br>15938 Quarry Road, Suite B-6<br>Lake Oswego, OR 97035 | *Counsel for objectors Amy B. Bográn and*<br>*Primie Real Estate LLC* |
| Leon Storie, Esq.<br>2824 Seventh Street<br>Tuscaloosa, AL 35401<br><br>Steven P. Gregory, Esq.<br>DICE & GREGORY LLC<br>2824 Seventh Street<br>Tuscaloosa, AL 35401 | *Counsel for objectors Jason Creamer and*<br>*Joann Jannik* |

| | |
|---|---|
| Arturo Alfonso, Esq.<br>Law Offices of Arturo Alfonso<br>Suite 125<br>7821 Coral Way<br>Miami, FL 33155<br><br>Norman Yatooma, Esq.<br>Norman Yatooma & Associates, P.C.<br>219 Elm Street<br>Birmingham, MI 48009 | *Counsel for objectors Rick Frazier,<br>Andrea Yatooma, Lenny Palmeri and<br>Gregory Yatooma* |
| N. Albert Bacharach, Jr., Esq.<br>115 Northeast 6th Avenue<br>Gainesville, FL 32601 | *Counsel for objectors Frank Stuart Yoes,<br>William H. Yoes, Milton J. Fontenots,<br>Fran DeJulius, Michael J. Rinis, Rinis<br>Travel Service, Inc., William H.<br>McWhorter, and Suzanne M. Colvin* |
| Wade T. Howard, Esq.<br>CASH ALLEN<br>JPMorgan Chase Tower<br>600 Travis, Sutie 6710<br>Houston, TX 77002 | *Counsel for Seth Silverman* |
| Nicole Ann Moschetta, *Pro Se*<br>333 Locust Street<br>Pittsburgh, PA 15218 | |
| Benjamin Windsor, *Pro Se*<br>18 Forest Glen<br>Pittsburgh, PA 15228 | |
| Tabitha Kirin, *Pro Se*<br>2745 Edgehill Avenue<br>Bronx, NY 10463 | |
| Robert L. Weinberg, Esq., *Pro Se*<br>5171 N. Thirty-Seventh Road<br>Arlington, VA 22207-1825 | |
| E.M. Selfe, *Pro Se*<br>2600 Arlington Avenue South<br>Apartment 84<br>Birmingham, AL 35205-4164 | |
| Stephen Tannenbaum, Esq., *Pro Se*<br>192 Menderis Road<br>Swan Lake, NY 12783 | |

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION. ...................................................................................................... 1

II.   FACTUAL BACKGROUND. ...................................................................................... 3

      A.   Foreign Currency Conversion Litigations Against American Express. ................. 3

      B.   American Express' Currency Conversion Practices And Disclosures. .................. 6

           1.   The Mechanics Of Foreign Currency Conversion. ..................................... 6

           2.   At All Relevant Times, American Express Has Expressly
                Disclosed Its Foreign Currency Conversion Practices. .............................. 9

      C.   Arbitration Provision. ............................................................................................ 10

      D.   The LiPuma Settlement. ........................................................................................ 11

           1.   The Original Agreement. ............................................................................. 11

           2.   The First Modification Of The Settlement. ................................................ 13

           3.   The Final Modification To The Settlement. ............................................... 14

           4.   The Settlement Class. .................................................................................. 15

           5.   Settlement Terms. ........................................................................................ 15

                a.   Disclosure Changes. ...................................................................... 15

                b.   Monetary Consideration And Charitable Contributions. ............... 16

           6.   Release. ....................................................................................................... 18

           7.   Preliminary Approval. ................................................................................. 18

           8.   Notice And Administration. ........................................................................ 19

           9.   Objections And Opt-Outs. ........................................................................... 20

           10.  Based On The Claim Volume Already Received By Rust, It
                Appears That No Portion Of The Settlement Fund Will Revert
                To American Express. .................................................................................. 22

III.  ARGUMENT. ............................................................................................................. 23

      A.   Standard For Settlement Approval. ....................................................................... 23

**TABLE OF CONTENTS**
(continued)

Page No.

B.   The Settlement Should Be Approved Because It Is The Product Of
     Informed, Arm's-Length Negotiations. .................................................24

C.   The Settlement Should Be Approved Because It Is Fair, Reasonable
     And Adequate. ........................................................................................26

     1.   The Settlement Should Be Approved Because The Claims
          Being Released Are Extremely Weak. .......................................26

          a.   American Express' Foreign Currency Conversion
               Disclosures And Practices Are Not Actionable Because
               American Express Sufficiently Discloses Its Rate-
               Setting Methodology And No Claim Lies Based On
               The Spread. ..............................................................27

          b.   American Express' Currency Conversion Practices Are
               Neither Unfair Nor Unconscionable; To The Contrary,
               Cardmembers Benefit From Using Their American
               Express Cards For Currency Conversion. .......................30

          c.   Cardmembers Are Not Harmed By American Express'
               Practices. ..................................................................31

          d.   The Arbitration Provision Precludes Recovery On A
               Class Basis. ...............................................................31

     2.   The Settlement Should Be Approved Because The Settlement
          Falls Within The Range Of Reasonableness. .............................34

          a.   The Settlement Consideration Is Substantial Compared
               To The Weakness Of The Claims Being Released. ............34

          b.   Claims Received To Date Confirm That There Will Be
               No Reversion To American Express And That The
               Claims Process Was Fair. ............................................35

          c.   The Intervenors' Argument That Their Claims Must Be
               Valued Separately Is Contrary To Well-Established
               Law. .......................................................................37

     3.   The Complexity, Expense And Duration Of Litigation, As Well
          As The Stage At Which Settlement Was Achieved, All Favor
          Final Approval. ...............................................................38

     4.   The Low Number Of Objectors And Significant Number Of
          Class Members Writing To Support American Express Favor
          Final Approval ...............................................................39

D.   Are The Objections To The Settlement Meritless. ..................................40

     1.   The Release Is Valid Based On The Claims Being Settled. .........40

**TABLE OF CONTENTS**
**(continued)**

Page No.

2.     The Settlement Notice Is Proper...............................................................44

3.     Plaintiffs LiPuma And Barrett And Their Counsel Adequately
       Have Represented The Class. ....................................................................46

4.     No Conflicts Exist Between Class Members...........................................47

IV.   CONCLUSION. ...............................................................................................................48

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

In re Agent Orange Product Liability Litigation,
  611 F. Supp. 1396 (E.D.N.Y.1985) ...................................................................... 47

In re Agent Orange Product Liability Litigation,
  818 F.2d 145 (2d Cir. 1987) ............................................................................... 26

Allied-Bruce Terminix Cos. v. Dobson,
  513 U.S. 265, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995) .................................. 33

Armstrong v. Board of Sch. Directors,
  616 F.2d 305 (7th Cir. 1980) ............................................................................. 26

In re Auction Houses Antitrust Litigation,
  42 Fed. App. 511 (2d Cir. 2002) ................................................................... 41, 42

In re Auction Houses Antitrust Litigation,
  No. 00 Civ. 0648(LAK), 2001 WL 170792 (S.D.N.Y. 2001) ........................... 42

Bank One, N.A., v. Coates,
  125 F. Supp. 2d 819 (S.D. Miss.  2001) ............................................................ 33

Behrens v. Wometco Enterprises, Inc.,
  118 F.R.D. 534 (S.D. Fla. 1988) ................................................................... 23, 34

Bell Atlantic Corp. v. Bolger,
  2 F.3d 1304 (3d Cir. 1993) ................................................................................ 45

Bennett v. Behring Corp.,
  737 F.2d 982 (11th Cir. 1984) ......................................................... 23, 24, 34, 48

Bildstein v. Mastercard International Inc.,
  329 F. Supp. 2d 410 (S.D.N.Y. 2004) ........................................................... 26, 39

Bonner v. City of Prichard,
  661 F.2d 1206 (11th Cir. 1981) ......................................................................... 23

Bowling v. Pfizer, Inc.,
  143 F.R.D. 141 (S.D. Ohio 1992) ...................................................................... 45

Brower v. Gateway 2000, Inc.,
  246 A.D.2d 246, 676 N.Y.S.2d 569 (1st Dept. 1998) .................................. 30, 32

In re Cendant Corp. Litigation,
  264 F.3d 201 (3d Cir. 2001) .............................................................................. 24

Central Fla. Investments, Inc. v. Parkwest Associates,
  40 P.3d 599 (Utah 2002) .................................................................................... 32

## TABLE OF AUTHORITIES
### (continued)

Page(s).

Chandler v. Blue Cross Blue Shield,
    833 P.2d 356 (Utah 1992)............................................................................................32

In re Corrugated Container Antitrust Litigation,
    643 F.2d 195 (5th Cir. 1981) .............................................................................41, 45

In re Corrugated Container Antitrust Litigation,
    659 F.2d 1322 (5th Cir. 1981) ...........................................................................23, 24

Cotton v. Hinton,
    559 F.2d 1326 (5th Cir. 1977) ...........................................................................23, 26

In Re Currency Conversion Fee Litigation,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003) .....................................................................33

Dean Witter Reynolds, Inc. v. Superior Court,
    211 Cal. App. 3d 758 (1989) ..............................................................................25, 30

Detroit v. Grinnell Corp.,
    495 F.2d 448 (2d Cir. 1974) .....................................................................................39

Follansbee v. Discover Financial Servs., Inc.,
    Case No. 99 C 3827, 2000 WL 804690 (N.D. Ill. 2000)........................................48

In re General America Life Insurance Co. Sales Practices Litigation,
    357 F.3d 800 (8th Cir. 2004) ...................................................................................43

Goetsch v. Shell Oil Co.,
    197 F.R.D. 574 (W.D.N.C. 2000)...........................................................................34

Green Tree Finance Corp.-Ala. v. Bazzle,
    539 U.S. 444, 123 S. Ct. 2402 (2003) ....................................................................33

Green Tree Finance Corp.-Ala. v. Randolph,
    531 U.S. 79, 121 S. Ct. 513 (2000) .........................................................................33

Hale v. First USA Bank, N.A.,
    2001 WL 687371 (S.D.N.Y. 2001) .........................................................................33

Hanlon v. Chrysler Corp.,
    150 F.3d 1011 (9th Cir. 1998) .................................................................................43

Holmes v. Continental Can Co.,
    706 F.2d 1144 (11th Cir. 1983) ...............................................................................47

Hutcherson v. Sears Roebuck & Co.,
    342 Ill. App. 3d 109, 793 N.E.2d 886 (1st Dist. 2003) ...........................................33

Jenkins v. First America Cash Advance of Georgia,
    __ F.3d __, 2005 WL 388269 (11th Cir. Feb. 18, 2005)........................................33

# TABLE OF AUTHORITIES
## (continued)

Page(s).

Johnson v. Chase Manhattan Bank USA, N.A.,
    2004 WL 413213 (N.Y. Sup. Feb. 27, 2004) .................................................. 32

Johnson v. West Suburban Bank,
    225 F.3d 366 (3d Cir. 2000) .................................................................... 33

In re Lloyd's America Trust Fund Litigation,
    No. 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).................... 37

Marsh v. First USA Bank, N.A.,
    103 F. Supp. 2d 909 (N.D. Tex. 2000) ...................................................... 34

In re M.D.C. Holdings Sec. Litig.,
    1990 WL 454747 (S.D. Cal. Aug. 30, 1990)............................................... 38

In re Mexico Money Transfer Litigation,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000)............................................ 28, 29, 30

In re Mexico Money Transfer Litigation,
    267 F.3d 743 (7th Cir. 2001) ...................................................... 28, 39

Mullane v. Central Hanover Bank & Trust Co.,
    339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 2d 865 (1950)................................... 44

In re NLO, Inc.,
    5 F.3d 154 (6th Cir. 1993) ...................................................................... 39

National Super Spuds, Inc. v. New York Mercantile Exchange,
    660 F.2d 9 (2d Cir. 1981) ................................................. 41, 42, 45, 46

Officers for Justice v. Civil Service Commission,
    688 F.2d 615 (9th Cir. 1982) .......................................................... 24, 34

In re PaineWebber Ltd. Partnerships Litigation,
    171 F.R.D. 104 (S.D.N.Y.,1997)...................................................... 47, 48

Petrovic v. AMOCO Oil Co.,
    200 F.3d 1140 (8th Cir. 1999) .................................................................. 47

Piambino v. Bailey,
    757 F.2d 1112 (11th Cir. 1985) ................................................................ 23

In re Prudential Insurance Co. of America Sales Practices Litigation,
    962 F. Supp. 450 (D.N.J. 1997)................................................................ 45

Ranieri v. Bell Atlantic Mobile, Inc.,
    304 A.D.2d 353, 759 N.Y.S.2d 448 (N.Y. App. 1st Dept. 2003)..................... 32

Reynolds v. Beneficial National Bank,
    288 F.3d 277 (7th Cir. 2002) .................................................................. 25

# TABLE OF AUTHORITIES
## (continued)

Page(s).

Ryan v. Dan's Food Stores, Inc.,
   972 P.2d 395 (Utah 1998)......................................................................................30

Sanchez v. Giromex, Inc.,
   JCCP No. 4159, 2004 WL 2750332 (Cal. App. 4 Dist. 2004) (unpublished)...................39

Southland Corp. v. Keating,
   465 U.S. 1, 104 S. Ct. 852 (1984) .......................................................................33

Spencer v. Peat, Marwick, Mitchell & Co.,
   Case No. Civ 4-84-794, 1986 WL 15155 (D. Minn. 1986)................................................48

Stephenson v. Dow Chemical Co.,
   273 F.3d 249 (2d Cir. 2001) ...............................................................................38

Stewart Agency, Inc. v. Robinson,
   805 So. 2d 726 (Fla. 4th DCA 2003)....................................................................30

Stoetzner v. United States Steel Corp.,
   897 F.2d 115 (3d Cir. 1990) ...............................................................................39

In re Sunbeam Securities Litigation,
   176 F. Supp. 2d 1323 (S.D. Fla. 2001)............................................................23, 39

Sydnor v. Conseco Finance Serv. Corp.,
   252 F.3d 302 (4th Cir. 2001) ...............................................................................33

TBK Partners, Ltd. v. W. Union Corp.,
   675 F.2d 456 (2d Cir. 1982) ...............................................................................41

In re Toys "R" Us Antitrust Litigation,
   191 F.R.D. 347 (E.D.N.Y. 2000)..........................................................................40

Trotsky v. Los Angeles Federal Sav. & Loan Association,
   48 Cal. App. 3d 134, 121 Cal. Rptr. 637 (1975) ....................................26, 45, 46

Tsadilas v. Providian National Bank,
   13 A.D.3d 190, 786 N.Y.S.2d 478 (N.Y.A.D. 1 Dept. 2004) ...........................32

Twigg v. Sears, Roebuck & Co.,
   153 F.3d 1222 (11th Cir. 1998) ..........................................................................44

UHL v. Thoroughbred Tech. & Telecomms., Inc.,
   Case No. IP 00-1232-C B/S, 2001 U.S. Dist. LEXIS 13115 (S.D. Ind. 2001) ...............48

United States v. City of Miami,
   614 F.2d 1322 (5th Cir. 1980) ............................................................................23

Vigil v. Sears National Bank,
   205 F. Supp. 2d 566 (E.D. La. 2002)...................................................................33

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s).</u>

<u>In re Vitamins Antitrust Litig.</u>,
   2000 WL 1737867 (D.D.C. Mar. 31, 2000) ........................................................................ 38

<u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>,
   396 F.3d 96 (2d Cir. 2005) ........................................................ 24, 37-41, 43, 45, 47

<u>In re Warfarin Sodium Antitrust Litigation</u>,
   391 F.3d 516 (3d Cir. 2004) ........................................................................................ 24

<u>White v. State of Ala.</u>,
   74 F.3d 1058 (11th Cir. 1996) .................................................................................... 44

**STATUTES**

9 U.S.C. § 2   ........................................................................................................................ 33

15 U.S.C. § 1640(a)(2)(B) .................................................................................................. 35

Fed. R. Civ. Proc. 23(e) ................................................................................................ 23, 44

Cal. Bus. & Prof. Code § 17200, <u>et</u> <u>seq.</u>.............................................................................. 3

Utah Code Ann. § 78-31a-107 (2003) .............................................................................. 32