UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No. 04-20314-CIV-ALTONAGA/Bandstra

NIGHT BOX
FILED

MAR 09 2005

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

EDWARD LIPUMA, on behalf of Himself
and All Others Similarly Situated and on
Behalf of the General Public,

          Plaintiff

   v.

AMERICAN EXPRESS COMPANY, a New
York Corporation, et al.,

          Defendants.

CLASS ACTION

## DECLARATION OF PROFESSOR SAMUEL ISSACHAROFF IN OPPOSITION TO FINAL SETTLEMENT APPROVAL

SAMUEL ISSACHAROFF declares based on personal knowledge as follows:

1.      I am the Harold J. Medina Professor in Procedural Jurisprudence at Columbia

Law School, having joined that faculty in 1999. I am spending this academic year as a

visiting professor at New York University School of Law. Previously, I spent ten years as a

professor of law at the University of Texas School of Law, where I held the Joseph D. Jamail

Centennial Chair in Law. In my scholarship and teaching I specialize in complex litigation.

I have published many articles on various aspects of complex litigation, including matters

such as class actions and attorneys' fees, which have been cited by numerous courts,

including the United States Supreme Court.

2.      I have also been involved as counsel, as an expert and as a consultant in a large number of complex cases, including dozens of class actions, on behalf of both plaintiffs and defendants; in addition, I have served as special master in a mass tort class action in the Eastern District of Texas.  I have testified before the Advisory Committee on the Rules of Practice and Procedure of The Judicial Conference of the United States and the Third Circuit Task Force on the Selection of Class Counsel regarding proposed amendments to the federal class action rule and other matters pertaining to the selection and compensation of class counsel.  I currently serve as Reporter for the Project on Aggregate Litigation of the American Law Institute.

3.      I have testified as an expert on many aspects of complex litigation in many courts at the state and federal level.  My academic writings on many areas of complex litigation have been extensively cited by many courts, including the U.S. Supreme Court.  I have attached to this report a copy of my curriculum vitae.  I have also provided a disclosure of all cases in which I have testified by deposition or in open court in the past four years, as well as my rate of compensation in this case.

4.      I have been asked by counsel for the Paul and Ball Intervenors to look at the extensive documentation in this case and examine the proposed settlement based on my experience both as an academic commentator and as an attorney involved in many class actions.  I cannot purport to offer this Court any opinions on fact finding or on the merits of the underlying claims.  That remains properly the exclusive province of the Court.  However, I can offer my opinions on one subject that has been a repeated source of controversy in class action settlements: the scope of the release afforded in this litigation and the negotiations posture of the parties in arriving at that settlement.

2

5.      In my opinion, the proposed settlement has two distinct features that have emerged as perhaps the most significant warning flags of improper class action settlements: a release markedly broader than any claims in the underlying litigation, and a settlement negotiations scenario where rival sets of plaintiffs' counsel appear to have been played off against each other.  I will address each of these concerns in turn.

6.      All class action settlements attempt to achieve a global peace for the challenged conduct of defendants.  The prospect of a cessation of litigation, the modern equivalent of the old bill of peace, is what induces defendants to settle.  In the course of settling, however, defendants will often seek a release of not just litigated claims but all claims that might be pressed against them, regardless of whether they are within the scope of the pending lawsuit.

7.      Because class actions are representative actions, in which most class members are not only absent but passive, and because of the finality that a class action affords to all terminated claims, courts have paid particular attention to the release in carrying out their Rule 23 duties of ensuring fair and adequate representation of the class.  The most striking and disturbing feature of the present proposed settlement is that the release reaches claims that were never pleaded in the underlying action and were negotiated away without any effort to assess their value.  The underlying actions, as I will return to shortly, alleged only that the American Express defendants added a one to two percent surcharge to all foreign transactions for citizens of either Florida or California, and that the failure adequately to disclose these charges violated Florida or California state law.  There were no other legal claims presented and there were no other sources of legal authority asserted.  Most critically,

it appears class counsel were did not adequately investigate and value the "rate selection" claims.

8.     There is no clearer warning bell in class action law than when the release obtained does not correspond to the claims pleaded. It is all the more disturbing to read in American Express's Response to Intervenor's First Set of Requests for Admissions that American Express did not provide class counsel with any information as to the value of the claims released, even though that information was apparently available to the defendants. This means that class counsel were entering a settlement to give up claims that not only were they unaware of, and did not plead, but that they apparently were in no position to value. The Eleventh Circuit expressly directs district courts to examine both "the range of possible recovery" and "the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable" as two critical factors in evaluating a settlement. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). Class counsel cannot possibly provide information about the range of possible recovery for released claims to this Court as a consideration in support of settlement if they negotiated a class settlement bereft of such critical information.

9.     The problem with the proposed settlement is by no means unique. Defendants settling class actions always seek as broad a release as possible. The sweep of the release puts plaintiffs' lawyers in a difficult position. To the extent that additional released claims are transactionally related to the underlying conduct and are merely alternative causes of action that could have been brought against the challenged conduct, the defendants' demands for finality and closure appear appropriate and have given courts little pause. To a large extent, a release that reaches all transactionally related claims is simply building into the

4

express terms of the settlement those claims that would likely be barred anyway by the operation of res judicata. Since claim preclusion would apply to all claims that were raised or could have been raised arising from the same transaction or occurrence, the class action release simply builds in additional protection against relitigation. Thus a release is most proper to the extent that it formalizes what parties and reviewing courts would likely conclude to have been all the transactionally related claims covered by the lawsuit.

10.     A release becomes increasingly problematic to the extent that it moves beyond what was actually litigated or what was at stake in the original litigation, and begins to cover unrelated matters.   When the release expands beyond transactionally-related claims, there are serious problems presented. First of all, there is the concern expressed by Justice Ginsburg in *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 621 (1997), that plaintiffs' counsel would be "disarmed" in the negotiations. Plaintiffs' counsel negotiating the settlement of claims never raised in the complaint and not transactionally related to claims in the complaint have neither the incentive nor the capacity to negotiate very strenuously over the terms of the release of such claims. Such plaintiffs' counsel have no leverage and no incentive to hold out since, by definition, claims not raised are not capable of being litigated.

11.     In *Amchem,* this concern was manifested by the claims of future asbestos claimants being settled. Future claimants are, by definition, not presently injured and have no claims before the courts. The Supreme Court in *Amchem* reversed in part because counsel were trying to settle a case representing future claimants that could not be certified or tried. For the Court, this raised the specter of inadequate representation, because such class counsel might be effectively "disarmed" in their efforts to secure the best possible deal for absent class members. 521 U.S. at 621. Where, as in the present action, the release is for claims not

5

even raised (as opposed to being incapable of being certified or tried as a class claim), the *Amchem* concern is even more compelling.

12.     Any settlement offer for claims not raised is a windfall for plaintiffs' attorneys, who will have no incentive to hold out for very much.  When settlement is offered on claims not raised, the plaintiffs' attorneys are being offered compensation for the additional value of released claims, even though they could not have been compensated for prosecuting such claims.  For such attorneys, the claims only have value if settled, and they are in no position to bargain hard over the true value of the released claims.  They cannot threaten to walk out on the proposed settlement with a dramatic "well, we'll see you in court" gesture; there is no other forum where they might press those claims other than the negotiating hall.  This was critical to the Court's ruling in *Amchem*: "Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, ... and the court would face a bargain proffered for its approval without the benefit of adversarial investigation." *Id.*, citing John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L.Rev. 1343, 1379-1380 (1995).

13.     Ultimately, the Court's concern with the lack of bargaining leverage was premised on the idea that disarmed counsel were of necessity inadequate class representatives.  *See* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, And Loyalty In Representative Litigation,* 100 Colum. L. Rev. 370, 399 (2000); Samuel Issacharoff, *"Shocked": Mass Torts And Aggregate Asbestos Litigation After Amchem And Ortiz,* 80 Tex. L. Rev. 1925, 1940 (2002).  Under Rule 23, a finding that counsel served as adequate representatives is critical to the certification of any class, regardless whether presented for litigation or settlement.

6

14.     The proposed settlement presents a release that, in my opinion, cannot be reconciled with the underlying cases. The present action, the proposed settlement vehicle, was originally filed in Florida state court on behalf of a class of only Florida citizens, and raising claims pertaining to only one type of transaction: the disputed 2 percent surcharge on foreign transactions charged on American Express cards. There were no claims brought on behalf of citizens of any other state; there were no allegations about any impropriety on foreign transactions independent of the 2 percent surcharge; and there were no claims premised on anything other than Florida state law, most centrally FDUPTA, the Florida state consumer protection law. Put another way, any res judicata effect of the trial or settlement of these claims could only reach Florida residents, and most likely only as to the 2 percent surcharge.

15.     As noted by the Paul and Ball Intervenors, the claims in the Florida state action did not cover the practices generally termed "rate selection" claims. Clearly, Florida counsel were free to prosecute or not prosecute any claims they wished. The problem arises when they try to settle claims that were not part of their case, that did not fall within the scope of their discovery, and that they did not attempt to independently value. At this point, not only were they without negotiating leverage, it was unclear whether they had any basis for knowing what a reasonable value for the claims might be. American Express has formally admitted that it did not quantify for class counsel the revenues it earned through its rate selection practices, and that it did not provide to class counsel documents or information that would have permitted them to value the rate selection claims. If true, not only were Florida counsel without leverage in negotiating over the value of the expanded release, they were in effect buying a pig in a poke.

7

16.     Similarly, the California action brought by the Environmental Law Foundation plaintiffs was initially limited to California citizens and tightly bound by California law, most centrally the California state private attorney general statute, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, but also claims under the California Consumers Legal Remedies Act, Civil Code §§ 1750 *et seq.* Subsequently the California action was expanded to allege a nationwide class, but still relied exclusively on the two California statutes.

17.     Like the *LiPuma* claims, the *ELF* claims seem to have related solely to the two percent surcharge issue, not to American Express' rate selection practices, based on the pleadings and the mediation statements in that case.

18.     The difficulty in this case arises with the scope of what was settled. Only after settlement negotiations were concluded was the Florida complaint amended to expand its scope nationwide, to expand the complained of conduct to reach beyond the two percent surcharge, and to add a thinly supported federal Truth in Lending Act ("TILA") claim as a predicate for removal to federal court. Indeed, there are allegations that these particular amendments were not only added at the request of the defendants who were seeking to expand the scope of the release that they could obtain through settlement, but were in fact drafted by defense counsel.

19.     I have seen a communication from Scott Pearson to Tucker Ronzetti, dated January 4, 2004, that indicates that this is in fact the case. Were this Court to find these allegations to be true, that would be a further source of serious concern. Moreover, the TILA claim does not even serve as a source of recovery to the class; under the settlement terms, the $500,000 recovery under TILA is not directed to the class, but is instead to be given away to

8

charity.  In effect, the parties appear to have purchased federal jurisdiction for a $500,000 charitable contribution.

20.     What seems uncontrovertible is that – based on the plain text of the pleadings in this case – the release offered in the proposed settlement is far beyond what either set of counsel had indicated an interest in prosecuting, binds people that would never have been bound by the litigation of the Florida and California state law claims, and covers conduct which most likely never would have been subsumed by any res judicata effect of the trial or settlement of the underlying state class action cases.

21.     This seems the paradigmatic case of lawyers negotiating for what was not theirs, having no leverage to ensure adequate consideration for the claims surrendered, and offering no "structural assurance of fair and adequate representation," as that term is used in *Amchem.*  521 U.S. at 627.

22.     Further, there are serious allegations that the negotiations themselves were conducted under the threat of a "reverse auction," a matter that I have addressed in my writings, as have other academics.  *See, e.g.,* Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 Sup. Ct. Rev. 337, 388; John C. Coffee, Jr ., *Class Wars: The Dilemma of the Mass Tort Class Action,* 95 Colum. L.Rev. 1343, 1370-73 (1995).

23.     The concept of the reverse auction is quite well developed in the academic literature.  The concern is that in overlapping class actions a defendant may wish to buy peace by cutting a deal with the weakest potential class counsel, thereby offering a windfall to lawyers who had no leverage in the case, other than the willingness to settle cheap.

24.     An excellent recent example is provided by the Seventh Circuit's rejection of a proposed class settlement in *Reynolds v. Beneficial Bank*, 288 F.3d 277, 280-81 (7th Cir. 2002), a case in which I served as counsel to objectors. In that case, a group of lawyers with effectively no clients and no cases on file offered a "nationwide settlement" in exchange for handsome fees and a paltry return to the class. The Seventh Circuit reversed the district court's grant of final approval of the settlement. In an opinion by Chief Judge Posner, the court of appeals found that lawyers who had every incentive to settle at virtually any price were inadequate class representatives, and voided the settlement on that basis. The lack of any real bargaining leverage led to the conclusion that "representation of the class was almost certainly inadequate." *Id.* at 284.

25.     The issue in this case is not a settlement achieved by lawyers with no cases on file and no leverage at all. But the record as I have seen it indicates that American Express did attempt to play off the Florida versus the California state court classes to achieve the broadest settlement at the cheapest price. The end result of class counsel's release of claims – the rate selection claims – that were not asserted on behalf of class members until after a settlement had been reached, implicates the same issues that caused the Seventh Circuit to reverse the district court judge in *Reynolds*.

26.     I offer three final observations about the proposed settlement as it pertains to the scope of the release. First, the Court in *Amchem* made clear that the task of a reviewing court is to review the representation afforded in class settlement negotiations. A reviewing court is not to engage in an impressionistic attempt to gauge whether the amount realized for the class in the settlement was a good deal or not. The *Amchem* Court disparagingly referred to such inquiries as being based on some "gestalt" impressions, or controlled by a

"chancellor's foot" approach, 521 U.S. at 621, neither an appropriate undertaking for a district court.

27.     Second, the structural problems in the representation afforded the class are not cured by the fact of the negotiations being conducted before a mediator, even one with such an impeccable reputation as Judge Stern. Undoubtedly Judge Stern reported accurately the arm's-length quality of the negotiations held in front of him. That, however, is not the appropriate legal standard.

28.     Class action settlements are not held simply to the standard of being non-collusive. The representational quality of a class action settlement, and its ability to bind absent parties, requires the higher threshold of constitutionally adequate representation, not merely non-collusive representation. The clearest example of this is provided by the Supreme Court's opinion in *Ortiz v. Fibreboard*, 527 U.S. 815 (1999), in which the Supreme Court overturned a class action settlement that was non-collusive and was negotiated in front of a mediator of the highest repute, in that case, sitting Fifth Circuit Judge Patrick Higginbottham. As with *Amchem*, the Court in *Ortiz* focused on whether class counsel was an adequate representative, rather than essay a guess at whether or not the settlement was sufficient or the negotiations appropriately arduous.

29.     Judge Stern's involvement in the mediation of this litigation does nothing to mitigate the concern that class counsel may have released claims that they had not valued and had investigated inadequately. The parties' mediation briefs – which dwell at length on the two percent surcharge claim but fail even to mention the rate selection claims – provide evidence that class counsel not only did not have leverage in the negotiation over the rate selection claims, but appear to have failed to value them at all for purposes of securing

11

compensation for the class. Judge Stern cannot be faulted for not considering the settlement value of claims that class counsel themselves apparently had neither asserted nor quantified.

30.     Third, there are further indicators of concern in this case that may be consistent with an underleveraged settlement. For example, the claims process is unconnected to any need to solicit information from the plaintiff class members. If American Express under the current settlement is able to use its electronic records to determine the amount of money that each claimant spent in foreign currency from 1999 through 2004, and then calculate the overcharge that will be refunded to each claimant, it is unclear why American Express cannot also determine which accounts included foreign purchases, and eliminate the requirement that class members mail in a claim form to be compensated. It is generally understood in the class action world that with each claims-made burden imposed on a class, the take-up rate will drop. Some justification for this burden seems necessary, other than simply the desire to keep the number of claims low.

## CONCLUSION

31.     Consistent with the foregoing, I believe that this Court should not approve the settlement as tendered. The release of all claims unconnected to the two percent surcharge and the conduct of whipsawed negotiations present this Court with strong evidence of a rushed settlement that does not provide adequate representation for the proposed settlement class.

I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

Samuel Issacharoff

Dated: March 6, 2005

# SAMUEL ISSACHAROFF

| | |
|---|---|
| Columbia Law School | Home Address |
| 435 West 116th Street | 300 West End Ave. |
| New York, NY 10027 | New York, N.Y. 10023 |
| (212) 854-2527, Fax: (212) 854-7946 | (212) 362-9461; Fax: (212) 501-0441 |
| email: sissac@law.columbia.edu | |

## ACADEMIC EXPERIENCE

*Columbia Law School*

- Harold R. Medina Professor in Procedural Jurisprudence (2001 - present)
- Professor (1999 - 2001)
- Visiting Professor (1998-1999)

*New York University School of Law*

- Visiting Professor (2004-2005)
- Tel: 212-998-6580

*University of Texas School of Law*

- Joseph D. Jamail Centennial Chair in Law (1998-1999)
- Charles Tilford McCormick Professor in Law (1994-1998)
- Professor and Preston Shirley Faculty Fellow (1993-94)
- Assistant Professor (1989-1993)

*University of Pennsylvania Law School*

- Lecturer in Law          (1986-1989)

  *Courses Taught:* Civil Procedure, Employment Law, Voting Rights and Redistricting Law, Constitutional Law, Complex Litigation, Legal Process

## EDUCATION

*Yale Law School, J.D. 1983*
- Editor, Yale Law Journal.

*Graduate Center, City University of New York*
- Graduate studies in Labor History (1976-77).
- University Fellowship, 1976.

*Universite de Paris, 1975-76*

*State University of New York at Binghamton, B.A. 1975*
- Major in History.

## PROFESSIONAL EXPERIENCE

· ***Guerrieri, Edmond & James, Washington, D.C.* (1988-1993)**
Of counsel, handling special litigation for labor law firm. Representing International Association of Machinists against Eastern Airlines in $1.5 billion RICO action and challenge to corporate asset transfers.

· ***Lawyers' Committee for Civil Rights Under Law, Washington, D.C.* (1985-1988)**
Staff attorney with Voting Rights Project (served as Acting Director of Voting Rights Project, 1985-86). Conducted voting rights litigation and other civil rights case work throughout the U.S. Served as co-counsel, lead counsel or consultant at all levels of federal practice, from District Court to U.S. Supreme Court.

· ***Kirschner, Walters, Willig, Weinberg & Dempsey, Associate, Phila., PA.* (1985)**
Union labor law practice representing public and private employees in court, arbitration and administrative proceedings.

· ***Lawyers' Committee for International Human Rights* (1984)**
Received J. Roderick MacArthur Fellowship to represent Lawyers' Committee in Argentina and Uruguay. Worked with Centro de Estudios Legales y Sociales in Buenos Aires on issues concerning transition from dictatorship to civilian government and prosecutions of former military rulers.

· ***United States Court of Appeals for the Third Circuit* (1983-84)**
Law Clerk to Honorable Arlin M. Adams.

## PUBLICATIONS

*Articles*

- *Collateral Damage:  The Endangered Center in American Politics*, 46 WILLIAM & MARY L. REV. 415 (2004).

- *The American Law of Repose*, 23 CIVIL JUSTICE QUARTERLY 324 (2004).

- *Where to Draw the Line: Judicial Review of Political Gerrymanders*, 153 PENN L. REV. 541 (2004)(with Pamela S. Karlan).

- *The Elusive Search for Constitutional Integrity: A Memorial for John Hart Ely*, 57 STANFORD L. REV.727 (2004).

- *Is Section 5 of the Voting Rights Act a Victim of Its Own Success?*, 105 COLUM. L. REV. 1710 (2004).

- *The Inevitability of Aggregate Settlements: An Institutional Account of American Tort Law*, ___ VANDERBILT L. REV. ___ (forthcoming 2005)(with John Fabian Witt).

- *Constitutionalizing Democracy in Fractured Societies*, 82 TEXAS L. REV. 1861 (2004).

- *Constitutionalizing Democracy in Fractured Societies*, 58 JOURNAL OF INTERNATIONAL AFFAIRS 73 (2004)(version of prior entry).

- *Throwing in the Towel: The Constitutional Morass of Campaign Finance*, 3 ELEC. L. J. 259 (2004).

- *Owen Fiss and the Warren Court Legacy: Politics, Law, and the Struggle for Equal Protection*, 58 MIAMI. L. REV. 35 (2003)(with Pamela S. Karlan).

- *Emergency Contexts Without Emergency Powers: The United States' Constitutional Approach to Rights During Wartime*, 2 INT'S JOURNAL OF CONSTITUTIONAL LAW 296 (2004)(with Richard H. Pildes).

- *Between Civil Libertarianism and Executive Unilateralism: An Institutional Process Approach to Rights During Wartime*, 5 THEORETICAL INQUIRIES IN LAW 1 (2003)(with Richard H. Pildes)(overlaps with prior article).

- *The Enabling Role of Democratic Constitutionalism: Fixed Rules and Some Implications for Contested Presidential Elections*, 81 TEX. L. REV. 1985 (2003).

- *Regulation for Conservatives: Human Decision Making and the Case for "Asymmetric Paternalism*," 151 PENN. L. REV. 1211 (2003)(with Colin Camerer, George Loewenstein, Ted O'Donoghue, and Matthew Rabin).

- *Law, Rules and Presidential Selection*, ___ POLITICAL SCIENCE QUARTERLY ____ (forthcoming 2005).

- *Gerrymanders and Political Cartels*, 116 HARV. L. REV. 593 (2002).

- *Why Elections?*, 116 HARV. L. REV. 684 (2002).

· *Preclusion, Due Process, and the Right to Opt Out of Class Actions*, 77 NOTRE DAME L. REV. 1057 (2002)

· *The Content of Our Casebooks: Why Cases Get Litigated*, 29 FL. ST. L. REV. 1265 (2002).

· *The Two Sides of Freedom of Expression*, 1 REVISTA DE DERECHO 79 (Universidad de Montevideo – 2002).

· *"Shocked": Mass Torts and Aggregate Asbestos Litigation After Amchem and Ortiz*, 80 U. TEX. L. REV. 1925 (2002).

· *Political Judgments*, 68 U. CHI. L. REV. 637 (2001).

· *Law and Misdirection in the Debate Over Affirmative Action*, 2002 UNIV. OF CHICAGO LEGAL FORUM 11.

· *Can Process Theory Constrain Courts?*, 72 U. COL. L. REV. 923 (2001)(with Michael C. Dorf).

· *Race and Campaign Finance Reform*, 79 N. CAR. L. REV. 1523 (2001).

· *The Difficult Path From Observation to Prescription*, 77 N. Y. U. L. REV 36 (2002).

· *Behavioral Decision Theory at the Court of Public Law*, 87 CORNELL L. REV. 671 (2002).

· *Governance and Legitimacy in the Law of Class Actions*, 1999 SUPREME COURT REVIEW 187.

· *Private Parties With Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 COLUM. L. REV. 274 (2001).

· *Introduction to Symposium: The Structures of Democratic Governance*, 100 COLUM. L. REV. 593 (2000).

· *Oversight of Regulated Political Markets*, 24 HARV. J. L & PUB. POL'Y 91 (2000).

· *The Vexing Problem of Reliance in Consumer Class Actions*, 74 TULANE. L. REV. 1633 (2000).

· *Discrimination with a Difference: Can Employment Discrimination Law Accommodate the Americans with Disabilities Act?*, 79 NORTH CAROLINA L. REV. 307 (2001)(with Justin Nelson).

· *The Hydraulics of Campaign Finance Reform*, 77 TEX. L. REV. 1705 (1999)(with Pamela Karlan).

· *Governing through Intermediaries*, 85 VIRGINIA L. REV. 1627 (1999)(with Daniel Ortiz).

· *Standing and Misunderstanding in Voting Rights Law*, 111 HARV. L. REV. 2276 (1998)(with Pamela Karlan).

· *Can Affirmative Action Be Defended?*, 59 OHIO ST. L. J. 669 (1998).

· *Can There Be a Behavioral Law and Economics?*, 51 VANDERBILT L. REV. 1729 (1998).

- *Group Litigation of Consumer Claims: Lessons of the American Experience,* 34 TEX. INT'L L. J. 135 (1999).

- *Politics as Markets: Partisan Lockups of the Democratic Process,* 50 STANFORD L. J. 643 (1998)(with Richard Pildes).

- *Creating Convergence: Debiasing Biased Litigants,* 22 J. OF LAW AND SOCIAL INQUIRY 913 (1998)(with Linda Babcock and George Loewenstein).

- *Is Age Discrimination Really Age Discrimination?: The ADEA's Unnatural Solution,* 72 N.Y.U. L. REV. 780 (1997)(with Erica Worth Harris).

- *Class Action Conflicts,* 30 U. C. DAVIS L. REV. 805 (1997).

- *The Constitutional Contours of Race and Politics,* 1995 SUPREME COURT REVIEW 45.

- *Contracting For Employment: The Limited Return of the Common Law,* 74 TEXAS LAW REVIEW 1783 (1996).

- *Identifying the Harm in Racial Gerrymandering Claims,* 1 MICH. J. OF RACE & LAW 47 (1996)(with Thomas C. Goldstein).

- *Supreme Court Destabilization of Single-Member Districts,* 1995 UNIV. OF CHICAGO LEGAL FORUM 205.

- *Unintended Consequences of Mandatory Disclosure,* 73 TEXAS L. REV. 753 (1995)(with George Loewenstein).

- *Groups and the Right to Vote,* 44 EMORY L. J. 869 (1995)

- *Women and the Workplace: Accommodating the Demands of Pregnancy,* 95 COL. L. REV. 2154 (1994)(with Elyse Rosenblum).

- *Race and Redistricting: Drawing Constitutional Lines after Shaw v. Reno,* 92 MICHIGAN LAW REVIEW 588 (1993)(with T. Alexander Aleinikoff).

- *Biased Judgments of Fairness in Bargaining,* 85 AMERICAN ECONOMIC REVIEW 1337 (1995)(with L. Babcock, G. Loewenstein, and C. Camerer).

- *Judging Politics: The Elusive Quest for Judicial Review of Political Fairness,* 71 TEXAS LAW REVIEW 1643 (1993).

- *Source Dependence in the Valuation of Objects,* 7 JOURNAL OF BEHAVIORAL DECISIONMAKING 157 (1994)(with G. Loewenstein)

- *Polarized Voting and the Political Process: The Transformation of Voting Rights Jurisprudence,* 90 MICH. L. REV. 1833 (1992).

- *When Substance Mandates Procedure: Martin v. Wilks and the Rights of Vested Incumbents in Civil Rights Consent Decrees,* 77 CORNELL L. REV. 189 (1992).

- *Self-Serving Assessments of Fairness and Pretrial Bargaining*, 22 JOURNAL OF LEGAL STUDIES 135 (1992)(with George Loewenstein, Colin Camerer, Linda Babcock).

- *The Census Undercount and Minority Representation: The Constitutional Obligation of the States to Guarantee Equal Representation*, 13 REVIEW OF LITIGATION 1 (1993)(with Allan J. Lichtman).

- *Administering Damage Awards in Mass-Tort Litigation*, 10 REV. OF LITIG. 463 (1991).

- *Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data*, 7 J. LAW & POLITICS 525 (1991)(with Allan J. Lichtman).

- *Second Thoughts About Summary Judgment*, 100 YALE L.J. 73 (1990)(with George Loewenstein).

- *Dictatorship on Trial: Prosecution of Human Rights Violations in Argentina*, 10 YALE J. INT'L LAW 118 (1985) (with E. Mignone and C. Estlund).

- *Note, Making the Violation Fit the Remedy: The Intent Standard and Equal Protection Law*, 92 YALE L.J. 328 (1982).

### *Review Essays*

- *Bearing the Costs*, Review of M. Kelman, STRATEGY OR PRINCIPLE?: THE CHOICE BETWEEN REGULATION AND TAXATION, 53 STAN. L. REV. 519 (2000).

- *Contractual Liberties in Discriminatory Markets*, Review of R. Epstein, FORBIDDEN GROUNDS, 70 TEX. L. REV. 1219 (1992).

- *Reconstructing Employment*, Review of P. Weiler, GOVERNING THE WORKPLACE: THE FUTURE OF LABOR AND EMPLOYMENT LAW, 104 HARV. L. REV. 607 (1990).

### *Books*

- CIVIL PROCEDURE (Foundation Press, Spring 2005).

- THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS (with Pamela Karlan and Richard Pildes)(Foundation Press, 1998).

- THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS (with Pamela Karlan and Richard Pildes)(Foundation Press, 2d. edition, 2001).

- THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS, Supplement 2004 (with Pamela Karlan and Richard Pildes)(Foundation Press, 2004).

- THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS, Supplement 2003 (with Pamela Karlan and Richard Pildes)(Foundation Press, 2003).

- THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS, Supplement 2001 (with Pamela Karlan and Richard Pildes)(Foundation Press, 2001).

- WHEN ELECTIONS GO BAD: THE LAW OF DEMOCRACY AND THE PRESIDENTIAL ELECTION OF 2000 (with Pamela Karlan and Richard Pildes) (Foundation Press, 2001).

- WHEN ELECTIONS GO BAD: THE LAW OF DEMOCRACY AND THE PRESIDENTIAL ELECTION OF 2000 (with Pamela Karlan and Richard Pildes) (Foundation Press, 2d. edition, 2001).

- PARTY FUNDING AND CAMPAIGN FINANCING IN INTERNATIONAL PERSPECTIVE (with K.D. Ewing) (Hart Press, London, forthcoming 2005).


### Book Chapters

- *Legal Regulation of Conflict of Interest*, in CONFLICTS OF INTEREST: PROBLEMS AND SOLUTIONS IN LAW, MEDICINE, AND ORGANIZATIONAL SETTINGS (M. Bazerman, G. Loewenstein, & D. Moore, eds., Cambridge Univ. Press, 2004).

- *Baker v. Carr in Context*, (with Stephen Ansolabehere), in CONSTITUTIONAL LAW STORIES 297-323 (M. Dorf, ed., Foundation Press, 2004).

- *Too Much Lawyering, Too Little Law*, in THE REFORM OF CIVIL PROCEDURE, (A.A.S. Zuckerman & R. Cranston, eds., Oxford Univ. Press, 1995).

- *Bargaining Impediments and Settlement Behavior* (with Charles Silver and Kent Syverud), in DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP, Anderson, ed., JAI Press, 1996).

- *The Redistricting Morass*, in AFFIRMATIVE ACTION AND REPRESENTATION, (A. Peacock, ed., Carolina Acad. Press, 1997).

- *Litigating for Equality of Political Opportunity*, in J. Lobel, ed., CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Clark, Boardman, 1987).


### Reports, Other Publications, and Current Manuscripts

- "Democracy Isn't Built On One Election Alone," WASHINGTON POST, Jan. 23, 2004, at B01.

- "Compensation for the Victims of September 11," Report for the Center for Transitional Justice, August, 2002 (with Anna Morawiec Mansfield).

- "In Real Elections, There Ought to Be Competition," NEW YORK TIMES, Feb. 16, 2002, at A19.

- "The Court's Legacy for Voting Rights," NEW YORK TIMES, DEC. 14, 2000, at A39.

- "Charles Alan Wright: The Scholar as Lawyer," in A TRIBUTE: CHARLES ALAN WRIGHT, THE MAN AND THE SCHOLAR (2000).

- "Due Process," INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL AND BEHAVIORAL SCIENCES (2000).

- "Political Fairness and Judicial Review," ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION (1998).

- "Not By 'Election Law' Alone," 32 LOYOLA L. REV. 1173 (1999)(with Richard Pildes).

- "The Census and the Constitution," ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION (1998).

- "Electoral Districting, Fairness and Judicial Review," ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION (1998).

- "Age Discrimination," ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION (1998)(with E. Harris).

- "The Destruction of Public Funding," TEXAS LAWYER, May 12, 1997, at 20 (with David Horan).

- "All for One," THE NEW REPUBLIC, Nov. 18, 1996, at 10 (with Richard Pildes).

- "No Place for Political Gerrymandering," TEXAS LAWYER, Aug. 5, 1996 (with Richard Pildes).

- "Racial Gerrymandering in a Complex World: A Reply to Judge Sentelle," 45 CATH. U. LAW REV. 1257 (1996).

- "Should There Be Rules of Procedure?," Leiden University, Institute of Anglo-American Law, Clifford Chance Distinguished Lecture Series (Feb. 1995).

- "Conference: The Supreme Court, Racial Politics, and the Right to Vote: *Shaw v. Reno* and the Future of the Voting Rights Act, 44 AMERICAN UNIV. L. REV. 1 (1994).

- "A Highly Visible Bloodletting," AUSTIN AMERICAN STATESMAN, Oct. 2, 1994 (Op-ed piece on redistricting).

- "Race and Redistricting," 2 RECONSTRUCTION, No. 3 (1994).

- "The State of Voting Rights Law," 3 ISSUES IN NATIONAL AFFAIRS No. 1 (1993)(Paper prepared for the American Jewish Committee).

- "Remedial Options for the Selection of the Texas Judiciary," Report prepared for settlement negotiations in *LULAC/Houston Lawyers' Association v. State of Texas*, Jan. 14, 1993,

- "Adjusting Census Data For Reapportionment: An Independent Role for the States," TEXAS LAWYER, March 18, 1991 (with A. Lichtman).

- "The 37.5 Percent Solution: 'Limited Voting' Could Rescue Judiciary," TEXAS LAWYER, March 5, 1990.

- "The Texas Judiciary and the Voting Rights Act: Background and Options," Report prepared for the Texas Policy Research Forum (1989).

- "The Generals Give Back Uruguay," Human Rights Report of the Lawyers' Committee for International Human Rights (1985)(with C. Estlund).

## SELECTED PROFESSIONAL ACTIVITIES

·  FELLOW, American Academy of Arts and Sciences.

·  MEMBER, American Law Institute.

·  REPORTER, Project on Aggregate Litigation, American Law Institute.

·  ADVISOR, Restatement Third Employment Law, American Law Institute.

·  MEMBER, Judicial Selection Task Force of the Texas Commission on Judicial Efficiency (1995-1997).

·  LEGAL CONSULTANT, National Research Council, Panel on Census Requirements in the Year 2000 and Beyond (1993-1995).

·  CONSULTANT, State of Florida, *Johnson v. DeGrandy*, 114 S.Ct. 2647 (1994)(Florida legislative redistricting litigation).

·  COUNSEL to State of Texas for 1992 Redistricting in *Richards v. Terrazas*, No. 91-1270 (U.S. Supreme Court), and *Texas v. United States*, No. 91-2383 (D.D.C.). (1992-1993).

·  SPECIAL MASTER TASKFORCE for Eastern District of Texas Asbestos Litigation, *Cimino v. Raymark Industries, Inc.*, 751 F.Supp. 649 (E.D. Tex. 1990). (1989-1990).

·  BOARD OF DIRECTORS, Lawyers' Committee for Civil Rights Under Law of Texas. (1991-1995); Executive Committee of the Board of Directors (1993-1995).

·  COUNSEL to State of Texas and University of Texas Law School in *Hopwood v. State of Texas and Regents of the University of Texas System*, No. 92 CA 563 (W.D. Texas, 1992)(challenge to School of Law affirmative action admissions practices)(1992-2001).

## ACADEMIC AWARDS

·  *Willis L. M. Reese Prize for Teaching*, Columbia Law School 2004
   Annual student-selected award to one faculty member

·  *Texas Excellence Teaching Award in the School of Law*, Univ. of Texas School of Law, 1994
   Annual student-selected award to one faculty member

·  *James W. Vick Texas Excellence Awards in Academic Advising*, Univ. of Texas, 1994
   University-Wide Award

·  *Open Door Award*, Univ. of Texas School of Law 1992
   Law School Student Award

## PERSONAL

· *Born:* Sept. 15, 1954, Buenos Aires, Argentina

· *Married* to Prof. Cynthia Estlund, Columbia Law School

· *Children:* Jessica, 17; Lucas, 16

## DEPOSITION AND COURT TESTIMONY OF SAMUEL ISSACHAROFF

1.      I am being compensated at the rate of $600 per hour.  That is my customary
        billing rate.


2.      I have given testimony in court or by deposition in the following cases over
        the past four years.

| CASE NAME | CASE NO. | COURT |
|---|---|---|
| ESTATE OF DOUGLAS SIMS v. WAL-MART STORES, INC | No. 01-2139 | S.D. Texas |
| CRA SYSTEMS INC v. SHARP ELECTRONICS CORPORATION | No. 99-1908-4 | State District Court, McClennan County, Texas |
| ARDOIN v. STINE LUMBER | No. 2001-004808, Div. G | 14th Judicial District, Calcasieu Parish, Louisiana |
| SMITH v. SPRINT COMMUNICATIONS | No. 99C3884 | N.D. Illinois |
| VALDEZ v. GRANT GEOPHYSICAL | No. DC–00–214 | State District Court, Starr County, Texas |
| McNAMARA v. BRE-X MINERALS LTD. | No. 597CV159 | E.D. Texas, Texarkana Div. |
| HUDSON V. STAUFFER CHEMICAL CO. | No. 98-3024-CI-7 | Pinellas County Circuit Court, Florida |
| SHAW v. TOSHIBA | No. 1:99cv0120 | E.D. Tex., Beaumont |
| In re LEASE OIL ANTITRUST LITIGATION | (No. II), MDL 1206 | S.D. Tex., Corpus Christi |
| VENEGAS v. ENTERPRISE LEASING CO. | No. 00-5196 CA WCM | 20th Judicial Circuit, Lee County, Florida |
| STATE OF TEXAS v. FARMERS GROUP, et al. | No. Gv 202501 | State District Court, Travis County, Texas |
| SMITH v. SPRINT COMMUNICATIONS, et al | No. 99 C 3844 | N.D. Ill. |
| HADDOCK v. NATIONWIDE FINANCIAL SERVICES, INC. | No. 3:01CV1552 (CFD) | D. Conn. |
| BRONSTER v. CHEVRON | No. 98-00792-SPK | D. Hawaii |
| MYER v. U.S. TRUST COMPANY OF CALIFORNIA | No. 00-147-D-M3 | M.D. Louisiana |
| PATERSON v. WESTERN UNION | No. 2-01-CV016 DF | E..D. Texas, Marshall Division |